UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| DANIEL O'DANIEL, | ) | CIV. 11-5088-JLV |
| | ) | |
| Plaintiff, | ) | |
| | ) | **REPORT** |
| vs. | ) | **AND RECOMMENDATION** |
| | ) | |
| HARTFORD LIFE INSURANCE | ) | |
| COMPANY and HARTFORD LIFE AND | ) | |
| ACCIDENT INSURANCE COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

**TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1-21

    A.    AD&D Insurance for BHFCU Members . . . . . . . . . . . . . . . . . 2-17

            1.    AMEX Life Insurance Company . . . . . . . . . . . . . . . . . . 4

            2.    General Electric Insurance Company . . . . . . . . . . . . 5

            3.    Fortis Benefits Insurance Company . . . . . . . . . . . . . 5-7

            4.    The Hartford Life Insurance Company . . . . . . . . . . . 7-17

                    a.    2001 Transaction with Fortis . . . . . . . . . . . . . 7-14

                    b.    The Hartford's Agreement with
                         Progeny/Affinion . . . . . . . . . . . . . . . . . . . . . .14-15

                    c.    The Hartford Issues a Policy for BHFCU
                         Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15-17

    B.    Jane O'Daniel's Death . . . . . . . . . . . . . . . . . . . . . . . . . . 17-19

i

C.      Mr. O'Daniel's Claim for Benefits . . . . . . . . . . . . . . . . . . . .19-21

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-85

A.      Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . . .22-24

B.      Plaintiff's Motion to Exclude the Affidavit of Mark Socha . 24-30

C.      Accidental Death and Dismemberment Insurance . . . . . . .30-35

D      Breach of Contract Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . 35-79

1.      Whether Carrier Changes Required Mr. O'Daniel's
Signature . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37-39

2.      Which AD&D Policy Applies . . . . . . . . . . . . . . . . . . .39-52

a.      The AMEX/GECA Policy Does Not Apply . . . .39-42

b.      Mr. O'Daniel's Failure to Receive
Notification of the Fortis-to-The Hartford
Conversion or a Certificate of Insurance on
The Hartford Policy . . . . . . . . . . . . . . . . . . . . .43-44

c.      The Training Kit was Not a Contract . . . . . . .44-49

d.      The Mailbox Rule is Not Material to the
Breach of Contract Claim . . . . . . . . . . . . . . . . 49-52

3.      Whether Jane O'Daniel's Death is Covered
Under The Hartford Policy . . . . . . . . . . . . . . . . . . . . 53-77

a.      Specific Provisions of The Hartford's Policy . . 53-56

b.      Basic Provisions of Contract Interpretation
Under South Dakota Law . . . . . . . . . . . . . . . . .56-59

c.      There is No Controlling South Dakota
Case Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .59-62

d.      There is a Split of Authority Among Other
Jurisdictions Interpreting the Same or Similar
Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . .63-77

4.      Prejudgment Interest . . . . . . . . . . . . . . . . . . . . . . . . .77-79

E.      **Bad Faith Claims** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .79-84

      1.     **Count Two–Bad Faith** . . . . . . . . . . . . . . . . . . . . . . . 79-80

      2.     **Count Three–Bad Faith** . . . . . . . . . . . . . . . . . . . . . 80-83

      3.     **Count Four–Bad Faith** . . . . . . . . . . . . . . . . . . . . . . .83-84

F.      **Deceit Claim** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .84-85

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .85-86

**NOTICE OF RIGHT TO APPEAL** . . . . . . . . . . . . . . . . . . . . . . . . . . . .86-87

**INTRODUCTION**

This diversity action is before the court on plaintiff Daniel O'Daniel's second amended complaint alleging breach of contract, deceit, and three counts of bad faith denial of accidental death and dismemberment insurance benefits on a policy insuring his late wife, Jane O'Daniel.  <u>See</u> Docket No. 47. Pending is Mr. O'Daniel's motion for partial summary judgment on the breach of contract claim.  Docket No. 49.  Defendants Hartford Life Insurance Company ("HLIC") and Hartford Life and Accident Insurance Company's ("HLAIC") (collectively "defendants") also cross-moved for summary judgment on all counts.  Docket No. 54.  The Chief District Judge, the Honorable Jeffrey L. Viken, referred these motions to this magistrate judge for a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

**FACTS**

Daniel O'Daniel is a citizen of South Dakota.  Defendants are incorporated under the law of Connecticut and maintain their principal place of business in Connecticut.  The Hartford is the parent company of both named defendants in this case, each of which is a subsidiary of The Hartford.  Plaintiff commenced this action seeking to recover $120,000 in accidental death benefits plus damages for bad-faith denial of insurance benefits and deceit under South Dakota law.  The following facts are gleaned from the parties'

statements of material facts and responsive documents. <u>See</u> Docket Nos. 50, 56, 67, 75, 79.

## A.   Accidental Death and Dismemberment Insurance for Black Hills Federal Credit Union Members

Mr. O'Daniel's claims involve a group accidental-death-and-dismemberment ("AD&D") insurance policy purchased by the Black Hills Federal Credit Union ("BHFCU") and made available to its members.  In 1993, Mr. O'Daniel became an insured under this program.   Mr. O'Daniel's wife, Jane, was also insured as an "eligible dependent" under the policy at a rate of 60% of the insurance value on Mr. O'Daniel.  Jane remained continuously insured under the policy until her death on September 3, 2010.

Under the program, BHFCU members were offered $1,000 in AD&D coverage at no cost to them, and were provided the opportunity to purchase additional supplemental coverage in various increments.  BHFCU has offered the program to its members since at least 1991.  In order to provide the AD&D program to its members, BHFCU entered into contracts with third parties to provide administrative services, including Affinion Benefits Group, LLC ("Affinion").  Affinion's predecessors include Benefit Consultants, Inc., FISI

("Financial Institute Services, Inc.")-Madison, and Progeny, Inc.[1]  Progeny/

Affinion also entered into contracts with insurers, including The Hartford.

The administrative services provided by Progeny/Affinion to BHFCU

included coordinating establishment of the BHFCU AD&D insurance program,

communicating with BHFCU members regarding the program, and

participating in the processing of claims made under the program.

Progeny/Affinion conducted direct-mail solicitation of credit union

members to inform them of their eligibility to participate in the program.

Progeny/Affinion recorded the information from the enrollment forms returned

by credit union members.  Progeny/Affinion billed for, collected, and

distributed premium payments back to the insurance carrier who issued the

policy.  On those occasions when BHFCU members submitted claims for

benefits under the program, Progeny/Affinion initially received the claims for

the purpose of verifying coverage.  Progeny/Affinion was also involved in

converting coverage from one insurer to the next, but Mr. O'Daniel disputes the

extent of Progeny/Affinion's involvement in these transitions.

Since 1991, five different insurance carriers provided AD&D insurance

polices to BHFCU.  The parties agree on the chronology of the conversions.

---

[1] Plaintiff refers to this entity by the acronym "BCFPA" (Benefit Consultants, FISI-Madison, Progeny, Affinion).  This court will refer to the third-party administrator and its predecessors as Progeny/Affinion for the purposes of this facts section.

From January 1, 1991 to June 30, 1996, AMEX Life Assurance Company provided AD&D coverage to BHFCU. From June 30, 1996 until April 1, 2001, General Electric Capital Assurance Company ("GECA") provided AD&D coverage to BHFCU. From April 1, 2001 until January 1, 2006, Fortis Benefits Insurance Company ("Fortis") provided AD&D coverage to BHFCU. From January 1, 2006 until April 1, 2012, The Hartford provided AD&D coverage to BHFCU. On April 1, 2012, subsequent to the relevant events in this lawsuit, CUNA Mutual Insurance Society became the AD&D insurance carrier for BHFCU. Mr. O'Daniel never signed any document authorizing any of these changes of AD&D carriers for the BHFCU AD&D policy.

### 1. AMEX Life Assurance Company

On November 11, 1992, while AMEX was the insurance carrier for BHFCU, Mr. O'Daniel enrolled in the program. Mr. O'Daniel's policy was effective on January 1, 1993. Mr. O'Daniel received $1,000 of AD&D insurance coverage at no cost to him, and elected to purchase $10,000 in supplemental coverage. Mr. O'Daniel listed his wife Jane O'Daniel as the policy beneficiary. Mr. O'Daniel received and kept a copy of the AMEX AD&D certificate of insurance.

## 2. General Electric Capital Assurance Company

After Mr. O'Daniel had enrolled in the program under the AMEX policy, AMEX merged with GECA. In June 1996, Progeny/Affinion prepared documents explaining that on June 30, 1996, GECA would become the AD&D insurer for the BHFCU program. Progeny/Affinion explained that GECA would assume all rights and obligations under AMEX's policy, and the terms and conditions of the AMEX policy would remain the same. Mr. O'Daniel denies receiving these documents notifying BHFCU members of the transition from AMEX to GECA.

## 3. Fortis Benefits Insurance Company

The AMEX-GECA coverage terminated and the Fortis coverage began on April 1, 2001. In January 2001, in preparation for this transition, Progeny/Affinion notified BHFCU members that Fortis would be the new AD&D underwriter and GECA would no longer be underwriting the coverage. The Fortis policy stated that Fortis would provide the original amount of insurance benefits and any subsequent increases in coverage elected by the Certificateholder. The Fortis policy defined "Certificateholder" as the customer of the policyholder (i.e., BHFCU) who was accepted by Fortis and paid the required premium.

The Hartford asserts that Progeny/Affinion used and presently uses an electronic management system known as Artemis to maintain information

about customer accounts.  Mr. O'Daniel denies that predecessors of Affinion used Artemis.  The Hartford claims that the information in Progeny/Affinion's system confirms that Mr. O'Daniel was sent the Fortis conversion notice and insurance certificate.  The Hartford cites a specific screen entry from February 23, 2001 noting that Mr. O'Daniel was sent "fulfillment documents" relating to the GECA-to-Fortis conversion.

Mr. O'Daniel denies receiving a notification letter related to the GECA-to-Fortis conversion and denies receiving a  certificate of insurance from  Fortis. He admits receiving a letter like the one he was shown in his deposition, but stated that letter was "asking if I wanted to increase my coverage."  Docket No. 75 at ¶36.  Mr. O'Daniel admits that Progeny/Affinion provided BHFCU members a Coverage Increase Request Form they could use to increase their insurance coverage under the Fortis policy.  He agrees that the increase request document listed Black Hills Federal Credit Union and Fortis Benefits Insurance Company at the top, but disputes the specific language of the form. The court notes that the coverage increase form was a tear-away portion at the bottom of the letter advising of the changeover from GECA to Fortis, so it would be difficult to receive one without receiving the other.  Mr. O'Daniel clearly received the bottom, tear-away coverage increase form because he filled it out and sent it in.

Mr. O'Daniel completed and turned in the Coverage Increase Request

form, increasing his supplemental coverage to $200,000, listing his wife Jane

as the policy beneficiary, and dating the form November 12, 2002. After

signing and turning in the Coverage Increase Request form, Mr. O'Daniel

understood that Fortis—not AMEX or GECA—was the insurer of his AD&D

policy. He now claims that Fortis is part of The Hartford.

**4.      The Hartford Life Insurance Company**

**a.      2001 Transaction with Fortis**

On January 25, 2001, Hartford Life, Inc., Hartford Life and Annuity

Insurance Company, and Hartford Life Insurance Company entered into an

Asset Purchase Agreement ("APA") with Fortis, Inc., Fortis Benefits Insurance

Company, Fortis Insurance Company, First Fortis Life Insurance Company,

Houston National Life Insurance Company, and John Alden Life Insurance

Company.[2] Only particular assets were purchased by the Hartford entities

---

[2]On the same date, defendant Hartford Life and Accident Insurance
Company entered a Stock Purchase Agreement ("SPA") with Fortis, Inc. The
SPA is filed in two places in the court's record. The first 50 pages of the
contract are filed at Docket No. 53-17. The last 9 pages of the contract are
found at Docket No. 53-43. The 59 pages of the SPA contract bear
contiguously numbered BATES stamps beginning with HART 002062 and
ended with HART002120. The SPA involves The Hartford's purchase of stock
from Fortis Advisors, Inc. and Fortis Investors, Inc. See Docket No. 53-17,
page 5. The BHFCU AD&D policy was issued by a different corporate entity,
Fortis Benefits Insurance Company. See Docket No. 60-1, page 1. There is no
allegation that Fortis Benefits Insurance Company is in any way related to the
two corporations the stock of which The Hartford purchased. Therefore, the
SPA appears to be completely irrelevant to the issues in this lawsuit.

from the Fortis entities in the APA. Mr. O'Daniel asserts that this 2001 transaction resulted in The Hartford purchasing *all* of Fortis' assets, including the BHFCU AD&D policy.

The APA is filed in two places in the court's record. The first 50 pages of the APA contract are filed at Docket No. 53-16. The last 47 pages of the contract can be found at Docket No. 53-40, pages 1-47. The 97 pages of the APA contract bear contiguously numbered BATES stamps beginning with HART002121 and ending with HART002217.[3]

The APA designates Fortis, Inc., Fortis Benefits Insurance Company, Fortis Insurance Company, First Fortis Life Insurance Company, Houston National Life Insurance Company, and John Alden Life Insurance Company as collectively "Seller Parties" and Hartford Life, Inc., Hartford Life and Annuity Insurance Company, and Hartford Life Insurance Company as collectively "Buyers." Docket No. 53-16 at 6 [HART002126]. The APA states: "the Seller Parties desire to sell and transfer to Buyers, and Buyers desire to purchase and assume, certain assets and liabilities used in or related to the operations of Business, **in addition to the Insurance Contracts**." Id. (emphasis added).

_____

[3]Also filed with the court is an Administrative Services Agreement contract between The Hartford and John Alden Life Insurance Company. It is found at Docket No. 53-41, pages 2-50, and Docket No. 53-42, pages 1-7. The John Alden contract is BATES stamped HART002222 through HART002277. This contract, like the SPA, appears to be completely irrelevant to the issues in this lawsuit.

The APA contains nine articles. These nine articles were provided to Mr. O'Daniel in discovery. See Docket Nos. 53-16 & -40. The last article listed in the Table of Contents, 9.11: "Counterparts," is set forth on page 92 of the APA. Docket No. 53-40 at 47 [HART002217]. The APA Table of Contents lists 31 Schedules and 8 Exhibits. These were not provided to the court, presumably because they were not provided to Mr. O'Daniel in discovery.

The remaining documents submitted by Mr. O'Daniel with the APA consist of an email exchange, an Administrative Service Agreement between John Alden Life Insurance Company and The Hartford, and a Modified Coinsurance Agreement between John Alden Life Insurance Company and The Hartford. These pages are all numbered consecutively with Hartford Bates stamp numbering. See Docket No. 53-40 at 48 to 53-42 at 7.

The following APA provisions are relevant to understand which contracts The Hartford purchased from Seller Parties, including Fortis:

**1.1 Definitions**
**"Insurance Contracts"** means only those contracts of insurance and annuities of the Insurers described on ***Schedule 1.2*** that have been issued or reinsured by one of the Insurers in connection with the Business and are in force on the Closing Date, or are subject to being renewed or reinstated in accordance with their terms on the Closing Date, together with all related binders, slips, and certificates (including applications therefor and all supplements, endorsements and riders in connection therewith)

\* \* \* \*

**"Purchased Assets"** means all of the following:
      (i)     the Woodbury Property;

<div style="margin-left: 2em;">

(ii)    the Owned Personal Property;

(iii)   The Owned Intellectual Property and all goodwill associated therewith;

(iv)   the Books and Records; and

(v)   the Transferred Contracts.

</div>

\*   \*   \*   \*

**"Transferred Contracts"** means the Material Contracts together with any and all Contracts entered into after the date hereof in accordance with the terms and conditions of Section 5.1(b)(i).

\*   \*   \*   \*

**"Material Contracts"** mean, collectively, the Contracts described in Section 3.14 together with the Personal Property Leases, the Real Property Leases and the Third Party Reinsurance Contracts.

\*   \*   \*   \*

**2.2 Assets, Liabilities, and Payments.**

<div style="margin-left: 2em;">

(a) Purchased Assets and Payments Owed by Insurers:

(i)    At the Closing, the Seller Parties shall sell, assign, transfer, convey, and deliver to Buyers, and Buyers shall purchase and accept from the Seller Parties, all of the Seller Parties' rights, title and interest in and to the Purchased Assets, free and clear of all Liens other than Permitted Liens.

</div>

\*   \*   \*   \*

**3.14 Material Contracts**

<div style="margin-left: 2em;">

(a)    ***Schedule 3.14*** lists all Contracts (**other than the Insurance Contracts**, the Real Property Leases, the Personal Property Leases and the Third Party Reinsurance Contracts) . . . . (emphasis supplied)

</div>

\*   \*   \*   \*

**5.1 Conduct of Business**

<div style="margin-left: 2em;">

. . .

(b)    Without limiting the generality of Section 5.1(a), and except as otherwise expressly provided in this Agreement, prior to the earlier of the Closing Date or termination of this Agreement, no Seller Party shall,

</div>

> without the prior written consent of Buyers (which consent shall not be unreasonably withheld, conditioned or delayed):
>
> (i)    enter into, terminate or fail to renew any contract that would constitute a Transferred Contract, other than in the ordinary course of business consistent with past practice;

<u>See</u> Docket No. 53-16, pages 16, 18-21, 23, & -40; Docket No. 53-40, pages 9-10, 20.

As noted above, the "Insurance Contracts" included in the transaction are listed in Schedule 1.2. The documents supplied by Mr. O'Daniel in support of his motion for partial summary judgment include a "Schedule 1.2." Docket No. 53-42 at 3-6 [HART002273- HART002276]. This document, however, relates to a separate contract, the Modified Coinsurance Agreement between John Alden Life Insurance Company and The Hartford. <u>See</u> Docket No. 53-41 at 30 [HART002250]. The document found at Docket No. 53-42, pages 3-6 is **not** the Schedule 1.2 that accompanies the APA contract.

The Hartford later produced a different Schedule 1.2 which the parties acknowledge is part of the APA. <u>See</u> Docket Nos. 69-1, 88 at 10. This correct Schedule 1.2 to the APA was attached to the affidavit of Mark Socha, a lawyer involved in the 2001 transaction. Mark Socha opines that The "Hartford did not acquire any accidental-death-and-dismemberment insurance policies, either individual or group, from Fortis in the Fortis Transaction." Docket No.

11

69 at ¶5. The court considers the affidavit of Mark Socha[4] and accompanying Schedule 1.2 as well as the APA and SPA to determine whether The Hartford purchased Fortis AD&D policies in 2001.

The correct Schedule 1.2 lists five pages of Fortis Insurance Company contracts, which The Hartford purchased. See Docket No. 69-1 at 4-8. None of them are described as AD&D policies. Id.

Plaintiff asserts that the Fortis AD&D policies were included in the 2001 transaction. See Docket No. 84 at 23-27. Plaintiff argues that the purchased assets in the 2001 transaction included "books and records," so The Hartford must have purchased Fortis' whole business, because the business could not operate without books and records. This argument is not persuasive.

The plain language of the contract specifies that The Hartford is purchasing "certain assets" from Fortis, not "all assets." Docket No. 53-16 at 6. Furthermore, the definition of "books and records" is limited to those books and records related to the "insurance contracts" or the "purchased assets." See Docket No. 53-16, page 9.[5] Since AD&D policies issued by Fortis Benefits

---

[4] Plaintiff's motion to exclude this affidavit is discussed in the body of this opinion.

[5]The definition of "books and records" actually limits the application to those books and records related to "purchased assets" or "business." One then looks to the definition of "business" to determine that that term means business activities related to the "insurance contracts" being purchased. See Docket No. 53-16, page 9.

Insurance Company are ***not*** "insurance contracts" being purchased by The Hartford under the APA, nor are they "purchased assets" under the APA, no books and records pertaining to AD&D policies were purchased by The Hartford.

Next, plaintiff points to the Schedule 1.2 that was provided in discovery, which only includes Insurance Contracts with John Alden Life Insurance Company.  From the face of the APA contract it is obvious that Fortis assets were included in the transaction, but it is also obvious that no Fortis Insurance Contracts were listed *on the Schedule 1.2 that was provided in discovery.*  So plaintiff asserts the court must look beyond Schedule 1.2 to conclude that *all* Fortis assets must have been included, as discussed above.

The flaw in plaintiff's argument is that the parties now acknowledge the Schedule 1.2 provided in discovery–filed atDocket No. 53-42, pages 3-6--was not part of the APA.  The correct Schedule 1.2 does include Fortis assets.  <u>See</u> Docket No. 69-1, pages 3-14.  As discussed above, Fortis Insurance Contracts *are* included in the correct APA Schedule 1.2, but no AD&D policies are listed.  <u>Id.</u>  Because the correct Schedule 1.2 lists the Insurance Contracts purchased in the 2001 transaction, the fact that no AD&D Insurance Contracts are listed means that The Hartford did not purchase any AD&D policies from Fortis.  This argument also fails.

Plaintiff also asserts that The Hartford purchased "material contracts" and that the BHFCU AD&D policy is a "material contract." Plaintiff asserts "material contracts" included those which would require a payout of $250,000 or more in a twelve-month period. Because plaintiff's contract alone could require a payout of $200,000, plaintiff's argument continues, the BHFCU contract must certainly exceed $250,000 or more. But the "material contracts" provision specifies "Contracts (*other than* the Insurance Contracts, the Real Property Leases, the Personal Property Leases and the Third Party Reinsurance Contracts)," so this court need not look to the enumerated types of contracts listed under "material contracts." Insurance contracts are not included in the definition of "material contracts."

The Fortis AD&D policies were not included in the 2001 transaction. The Hartford only purchased certain assets of Fortis, as outlined in the APA. Fortis AD&D policies are not among those assets listed as having been purchased by The Hartford.

### b. The Hartford's Agreement with Progeny/Affinion

Progeny/Affinion and The Hartford entered into an Administrative Services Agreement on May 28, 2004. The agreement provides that Progeny/Affinion will prepare and distribute promotional materials, review applications or enrollment forms of prospective insureds, prepare and issue all certificates of coverage with other materials, print and deliver privacy policies,

implement all rate and benefit changes, maintain accounting, administrative, and statistical records, respond to correspondence relating to policies, prepare and send monthly premium reports to The Hartford, maintain a toll-free customer service number, give written notice to insureds of termination of coverage, perform telemarketing, bill policyholders or the insureds, pay all monies due to The Hartford, maintain a fiduciary account for The Hartford's money, maintain liability insurance, notify The Hartford of all legal proceedings, maintain complaint letters for at least seven years, maintain all required insurance licenses, receive claims and verify coverage, and provide mutually agreed test marketing. The agreement entitles Progeny/Affinion to a "Persistency Bonus" if The Hartford's gross premiums per year exceed $332 million.

In July, 2005 Progeny/Affinion and The Hartford entered into an Amendment, under which Progeny/Affinion promised that "As of June 30th, 2006," it "will transfer to The Hartford all of the portions of the Fortis Block remaining in force as of that time" (excluding any policies that could not legally be converted). Progeny/Affinion agreed that it "shall not transfer any such policies to an alternate underwriter." Progeny/Affinion earned a bonus if it transferred at least $40 million in annual premium value of the Fortis Block to The Hartford by December 31, 2005.

### c. The Hartford Issues a Policy for BHFCU Members

The parties agree that in 2005, the insurance carrier for the BHFCU AD&D program changed again. Mr. O'Daniel claims that Fortis was already a part of The Hartford at the time of this change. However, that claim is not borne out by a close analysis of the APA, as discussed above.

Pursuant to its contract with Hartford, Progeny/Affinion created a document for BHFCU titled "Black Hills Federal Credit Union Accidental Death & Dismemberment Program Training Kit." The Training Kit contained answers to frequently asked questions regarding the conversion from Fortis to Hartford. Progeny/Affinion explained that members "automatically receive six added benefits that are included with your insurance"—Common Carrier Accidental Death, Educational Assistance, Anti-Inflation, Hospital Income Benefit, Day Care Benefit, and an Adaptive Home and Vehicle benefit.

Progeny/Affinion also drafted a letter to be sent to BHFCU members from BHFCU President Roger R. Heacock explaining that Hartford Life and Accident Insurance Company would be the new AD&D carrier as of January 1, 2006, and that "[t]he Hartford AD&D plan replaces your current AD&D plan." The transition letter directed members to "[p]lease see your Certificate of Insurance as there may be . . . changes to the program," and pointed out that "[t]he new policy benefit language utilizes The Hartford's provisions, definitions, filed language and forms." The Hartford policy provided that covered persons would

be covered for the same benefit amounts and the same beneficiary designation as under the prior policy.  The Hartford asserts that its policy did not "promise continuation of the terms of any previous policy."  Docket No. 56 at ¶70.

Progeny/Affinion created a database containing the names, addresses, and other pertinent information of the credit union members enrolled in the BHFCU AD&D program.  Progeny/Affinion then sent this database file to Vertis Communications, its print vendor at the time.  Vertis was to send a "conversion package" consisting of the letter from Roger Heacock and the Hartford certificate of insurance to credit union members.  Mr. O'Daniel denies generally that Vertis mailed the conversion package to 100% of insured credit union members and specifically denies that the documents were sent to him.

**B.      Jane O'Daniel's Death**

On January 5, 1996, Jane O'Daniel was driving her car when it was struck from the rear by another vehicle.  Following the accident, Ms. O'Daniel was treated at an emergency room for neck pain, underwent a cervical spine X-ray which was negative, and was placed in a soft collar and prescribed painkillers.  Ms. O'Daniel subsequently complained of persistent neck pain, headaches, and associated nausea.  Medical providers treated her primarily with pain medications, trigger-point injections, nerve blocks, and relaxation and biofeedback techniques.

In February 1998, Ms. O'Daniel was diagnosed with a flexion extension (whiplash) injury and "something similar to a chronic tension type headache." In December 2003, Ms. O'Daniel was diagnosed with a complex regional pain syndrome injury. Medical providers also described Ms. O'Daniel's condition as occipital neuralgia, persistent headache syndrome, severe protracted chronic headache syndrome, and "chronic pain syndrome."

In April 2000, Ms. O'Daniel was prescribed a Duragesic transdermal patch for her pain. Duragesic is a patch that delivers medication through the user's skin by means of a gel mixture. The active ingredient in the Duragesic patch is a powerful narcotic known as fentanyl, which is used to treat persistent moderate to severe chronic pain. The parties agree that in October 2007, Ms. O'Daniel was found unresponsive and "barely breathing" at home due to the effects of narcotic pain medication. The parties dispute whether fentanyl was the cause of this episode, although Ms. O'Daniel was wearing a fentanyl patch at the time.

In July 2010, Ms. O'Daniel was again prescribed fentanyl patches by her medical providers. On August 29, 2010, Ms. O'Daniel obtained a refill of the fentanyl patches. On September 2, 2010, Ms. O'Daniel applied a new patch. At 8:08 a.m. September 3, 2010, Mr. O'Daniel discovered Ms. O'Daniel slumped over side of their bed and unresponsive. An autopsy by pathologist Susan L. Eliason, M.D., found fentanyl in Ms. O'Daniel's blood at a level of 23.4

nanograms per milliliter.  Dr. Eliason concluded that Ms. O'Daniel's cause of death was "due to [f]entanyl toxicity."

Mr. O'Daniel brought a product liability case against the manufacturer of the fentanyl patch his wife was wearing and has settled that claim.

## C.    Mr. O'Daniel's Claim for AD&D Benefits

Following Ms. O'Daniel's death, Plaintiff contacted Progeny/Affinion to initiate a claim for AD&D insurance benefits under the BHFCU policy.  After being instructed as to the documents he should submit, Mr. O'Daniel sent documents to Progeny/Affinion, which then forwarded them to The Hartford. The Hartford obtained Ms. O'Daniel's medical records for the 12 months preceding her death and obtained records of the investigation by the Pennington County Sheriff's Office of Ms. O'Daniel's death.  The Hartford confirmed that Ms. O'Daniel had been prescribed the fentanyl patches to treat her chronic pain.

The Hartford's claim analyst referred the file for a toxicology review by an internal medical case manager named Kathleen M. Bell.  Ms. Bell is a Registered Nurse and a Certified Case Manager, Certified Legal Nurse Consultant, Licensed Health Care Risk Manager, Certified Disability Management Specialist, and Legal Nurse Consultant—Certified Specialist.  Mr. Mr. O'Daniel disputes The Hartford's characterization that Jane O'Daniel died of a "therapeutic" dose of fentanyl.  Mr. O'Daniel claims Nurse Bell incorrectly

19

calculated the average and range relating to fatal overdoes of fentanyl. Mr. O'Daniel disputes Nurse Bell's methodology, but agrees with the conclusion that "Hartford found no evidence to suggest that Ms. O'Daniel was taking the fentanyl patches other than as prescribed by her medical providers." Docket No. 56 at ¶101 and Docket No. 75 at ¶101.

In a letter dated May 26, 2011, The Hartford notified Mr. O'Daniel that his claim had been denied. The Hartford concluded that because Ms. O'Daniel's death was caused by fentanyl toxicity, and fentanyl had been prescribed to treat her chronic pain, her death resulted from medical treatment for a sickness or disease, and therefore was not a covered injury under the terms of the policy. The Hartford notified Mr. O'Daniel of his right to appeal Hartford's decision and review pertinent documents in his file. The Hartford asked that Mr. O'Daniel's appeal clearly outline his position and any issues or comments he had in connection with the claim and The Hartford's decision.

In a letter to The Hartford dated June 9, 2011, Mr. O'Daniel's attorney contacted The Hartford and requested a copy of "your entire file" and a copy of "the policy." In a letter to The Hartford dated July 21, 2011, Mr. O'Daniel's attorney initiated an appeal. The attorney acknowledged that The Hartford sent him the claim file including The Hartford's policy, but added that The Hartford had not sent the policy that Mr. O'Daniel received when he purchased the insurance. Without that policy, the attorney stated, he could not be specific

about the grounds for Mr. O'Daniel's appeal. A representative from The Hartford spoke to Mr. O'Daniel's attorney on August 1, 2011, and explained that The Hartford did not have the policy that the attorney was seeking.

In a letter to Mr. O'Daniel's attorney dated August 1, 2011, The Hartford acknowledged Mr. O'Daniel's appeal, and invited him to provide additional information in support of the appeal. In a letter dated September 26, 2011, The Hartford notified Mr. O'Daniel's attorney that it had not received any additional information in support of the appeal, adding that it considered the appeal complete and would begin to consider it.

In a letter dated October 12, 2011, The Hartford notified Mr. O'Daniel's attorney that it was affirming its initial decision denying benefits. Mr. O'Daniel alleges The Hartford denied his claim without a reasonable basis. Mr. O'Daniel asserts that "[The] Hartford decides claims based on the Hartford policy, without regard for what the original policy said." Docket No. 75 at ¶145. He notes that employees including internal appeals specialist David Cohen and claims handler Dawn Libin were unaware of various provisions of South Dakota law. After defendants' issued their October, 2011, letter, Mr. O'Daniel filed this lawsuit.

**DISCUSSION**

**A.     Summary Judgment Standard**

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "However, the fact that both sides may move for summary judgment does not automatically establish that either side is entitled to such a judgment." United States v. Porter, 581 F.2d 698, 703 (8th Cir. 1978) (citing 10 Wright & Miller, FEDERAL PRACTICE AND PROCEDURE, § 2720, pp. 459-66).

The court must view the facts, and inferences from those facts, in the light most favorable to the nonmoving party. See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Helton v. Southland Racing Corp., 600 F.3d 954, 957 (8th Cir. 2010). Summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

The burden is placed on the moving party to establish both the absence of any genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Once the movant has met its burden, the nonmoving party may not simply rest on the allegations in the

pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Fed. R. Civ. P. 56(e)(each party must properly support its own assertions of fact and properly address the opposing party's assertions of fact, as required by Rule 56(c)).

The underlying substantive law identifies which facts are "material" for purposes of a motion for summary judgment.  Anderson, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  Id.; see also 10A Charles A. Wright, Arthur Miller, & Mary Ann Kane, Federal Practice and Procedure § 2725, pp. 93-95 (1983).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson, 477 U.S. at 247-48 (emphasis in original).

Essentially, the availability of summary judgment turns on whether a proper jury question is presented:  "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only

by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250.

**B.      Plaintiff's Motion to Exclude the Affidavit of Mark Socha**

Plaintiff moves to strike the affidavit of Mark Socha and the accompanying exhibit, the correct Schedule 1.2.  Plaintiff argues that the court should not consider the correct Schedule 1.2 was not produced in discovery. Plaintiff argues that the court should not consider Mark Socha's testimony because The Hartford did not disclose Socha as an individual likely to have discoverable information.  Docket No. 77.  The Hartford resists this motion. Docket No. 86.  Plaintiff cites Rule 37 for the remedy of exclusion.

Rule 37 provides, in pertinent part, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  FED. R. CIV. P. 37(c).  In addition to or instead of the remedy of exclusion of the information or witness, the court may "order payment of the reasonable expenses, including attorney's fees, caused by the failure."  Id.

Rule 26(a)(1)(A)(i) provides, in pertinent part, that a party must, "without awaiting a discovery request," provide "the name and, if known, the address and telephone number of each individual likely to have discoverable information–along with the subjects of that information–that the disclosing

party may use to support its claims or defenses, unless the use would be solely for impeachment." FED. R. CIV. P. 26(a)(1)(A)(i). "A party is not excused from making its initial disclosures because it has not fully investigated the case or because it challenges the sufficiency of another party's disclosures or because another party has not made its disclosures." FED. R. CIV. P. 26(a)(1)(E). Under Rule 26(e), "if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing," the party must supplement or correct its disclosure or response. FED. R. CIV. P. 26(e)(1).

Within the Eighth Circuit, courts consider the following factors to determine the remedy for an untimely disclosure: "the reason for noncompliance, the surprise and prejudice to the opposing party, the extent to which allowing the information or testimony would disrupt the order and efficiency of the trial, and the importance of the information or testimony." Wegener v. Johnson, 527 F.3d 687, 692 (8th Cir. 2008). After considering these factors, the court concludes exclusion of the affidavit is not appropriate in this case.

On November 10, 2011, plaintiff filed his complaint, alleging that Hartford purchased Fortis. Docket No.1 The Hartford answered that "Hartford Financial Services Group purchased Fortis Financial Group in 2001." Docket

No. 11 at ¶8.  On January 7, 2012, plaintiff filed an amended complaint, maintaining his assertion that The Hartford purchased Fortis.  Docket No. 16 at ¶8.  On January 17, 2013, defendants made initial disclosures pursuant to Rule 26(a).  The Hartford did not list Mark Socha as an individual likely to have discoverable information.  On January 20, 2012, defendants filed an amended answer again stating that "Hartford Financial Services Group purchased Fortis Financial Group in 2001."  Docket No. 18 at ¶8.

On January 23, 2012, Mr. O'Daniel served his first requests for production on The Hartford, seeking all documents that support the statement that "Hartford Financial Services Group purchased Fortis Financial Group in 2001."  Docket No. 78 at 2.  Defendants responded that they had realized Hartford Life and Accident Insurance Company, not Hartford Financial Services Group, was the acquiring party in the relevant transaction.  After the court entered a protective order, on April 6, 2012 defendants amended their answer to read: "Hartford Life and Accident Insurance Company purchased Fortis Financial Group in 2001."  Docket No. 20 at ¶8.

On June 7, 2012, defendants produced two documents in response to the request for production relating to the Fortis-Hartford transaction:  the Asset Purchase Agreement ("APA") and Stock Purchase Agreement ("SPA"). From the table of contents of the APA, it is clear the agreement contains 31 Schedules and 8 Exhibits.  The Hartford does not dispute that "Mr. O'Daniel

did not ask for the schedules, and Defendants did not produce them." Docket No. 86 at 10. Nor did defendants supplement their initial disclosures to include Mark Socha as a potential witness. Defendants' theory is they could not have predicted that Mr. Socha's testimony and Schedule 1.2 would be needed during discovery. In response to plaintiff's motion for summary judgment, defendants filed the affidavit of Mark Socha and a Schedule 1.2 related to the APA. This is the document plaintiff now seeks to exclude.

As discussed above, The Hartford did provide in response to plaintiff's discovery request the wrong Schedule 1.2 which related to the John Alden Life Insurance Company contract. The parties now agree that the two different Schedule 1.2s relate to two different contracts. <u>See also</u> Docket No. 86 at 11n.3. The Hartford's explanation for its discovery lapse does not hold water. If The Hartford thought that the schedule belonging to the John Alden contract was included with plaintiff's request for "all documents," why should not every schedule belonging to the APA contract also be within the scope of plaintiff's discovery request? By producing the wrong Schedule 1.2, The Hartford did not necessarily produce false and misleading documents–but The Hartford certainly failed to produce documents that were responsive to plaintiff's request for production under Rule 34–namely the correct Schedule 1.2.

The Hartford asserts that it did not know the Fortis-Hartford transaction was relevant to its defense until Mr. O'Daniel filed his motion for summary

27

judgment.  The record belies this argument.  At the time Mr. O'Daniel filed his

first request for production, on January 23, 2012, The Hartford had twice

asserted that it purchased Fortis.  Only in responding to plaintiff's request for

production did The Hartford realize it desired to amend this assertion.  On

April 6, 2012, The Hartford amended its answer to clarify the nature of the

2001 transaction.  At this point, if not earlier, The Hartford should have

supplemented its initial disclosures to include Mark Socha.  Mark Socha could

have been deposed and clarified that the 2001 transaction was irrelevant

because no AD&D policies were purchased.  Instead, plaintiff's counsel had

"never heard of Mark Socha" until his affidavit was filed on April 15, 2013, in

these summary judgment motions.  Docket No. 77.

Thus, The Hartford's alleged reason for noncompliance does not weigh in

its favor.  The untimely disclosure was not justified.  Plaintiff was clearly

surprised by the affidavit and accompanying exhibit.  Plaintiff did mistakenly

rely on the John Alden Schedule 1.2.  Compare Docket 53-42 at 3

[HART002273] and Docket No. 69-1.  Further, plaintiff did not ask for the

Schedules to the APA, but he shouldn't have had to so specify.  His request for

production clearly requested *all* documents that support the statement that

"Hartford Financial Services Group purchased Fortis Financial Group in 2001."

However, including the affidavit and exhibit does not disrupt the order

and efficiency of this case–in fact the opposite is true.  Without the affidavit

28

and exhibit, this court cannot decide whether The Hartford purchased only certain assets of Fortis, or Fortis in its entirety, or whether the "insurance contracts" purchased included AD&D policies issued by Fortis Benefit Insurance Company. The affidavit and exhibit are important to the resolution of these summary judgment motions because the APA Schedules are necessary to understand the APA. If defendant had not filed the exhibit to Mark Socha's affidavit, the court would have requested that defendant do so. How else would the court determine which insurance contracts were purchased in the transaction? Schedule 1.2 is necessary to determine that The Hartford did not purchase any Fortis AD&D policies. Further, the Schedules are part of the contract:

> **9.1 Entire Agreement; Third Party Beneficiaries.** Except as otherwise expressly provided herein, this Agreement (*including the Schedules and Exhibits hereto*) constitutes the entire agreement between the parties with respect to the transactions contemplated hereby and supersedes all prior arrangements or understandings with respect thereto, written or oral . . . .

Docket No. 53-40 at 42 [HART002212] (emphasis supplied).

The court concludes the failure to disclose and supplement was harmless to plaintiff because, as discussed in greater detail below, the court finds in plaintiff's favor on the coverage issue. The affidavit is necessary to the court's disposition of plaintiff's argument that The Hartford purchased Fortis in its entirety. However, sanctions against The Hartford are appropriate.

The court has wide discretion to fashion sanctions. Wegener, 527 F.3d at 692. Under Rule 37(c), the court "may order payment of the reasonable expenses, including attorney's fees, caused by the failure [to disclose or supplement an earlier response]." FED. R. CIV. P. 37(c)(1)(A). This court invites Mr. O'Daniel's counsel to submit a request for attorneys' fees for the time spent drafting the motion to exclude [Docket No. 77] and the reply to defendant's memorandum in opposition [Docket No. 88].

## C.     Group Accidental Death and Dismemberment Insurance

A significant threshold issue in this case is what type of insurance Mr. O'Daniel had purchased through BHFCU. Mr. O'Daniel received AD&D coverage as a benefit of his membership in BHFCU and later elected to purchase additional supplemental insurance. His argument that he did not have group insurance is not persuasive. He admits that the Policyholder was BHFCU, not himself. Docket No. 75 at ¶ 74. But he then cites to SDCL § 58-17-2, a South Dakota provision relating to health insurance, to assert that he was the "policyholder" as well as the insured. Docket No. 84 at 10. Mr. O'Daniel further asserts that "insured" and "policyholder" are synonymous. Id. at 12 (citing Anspach v. United of Omaha Life Ins. Co., No. 10-5080, 2013 WL 842450, at *4, (D.S.D. Mar. 6, 2013)). But the plaintiff in the Anspach case sought to recover under a group life insurance policy offered through her employer, not an individual policy. Anspach, 2013 WL 842450, at *1, *5.

30

Group insurance is distinct from one person or family purchasing an individual policy through an insurance agent. In group insurance policies, one central entity such as an employer, labor union, or credit union is the policyholder. Association members are insured through the master policy held by the association. Commonly the insurance carrier issuing the policy has a duty to deliver certificates of insurance to the policyholder, or central entity–here BHFCU. It is then the central entity's duty–BHFCU's duty–to deliver certificates of insurance to individual members. See generally 44A AM. JUR. 2D *Insurance* § 1831, 1861 (2013); COUCH ON INSURANCE § 8:7, 8:20 (3d ed. 2012); see also Distler v. Horace Mann Life Ins. Co., 644 N.E.2d 918, 921 (Ind. Ct. App. 1994) (where statute required policy of group life insurance to state that "the insurer will issue to the policyholder, for delivery to each person insured, a certificate" setting forth protections, beneficiary and rights and conditions, court held "plain language of the statute requires an insurer to provide the policyholder, not each individual insured, with certificates telling the employee who the beneficiary is. It is then the responsibility of the policyholder, not the insurer, to deliver the certificates to each individual insured."); Mosior v. Ins. Co. of North America, 473 A.2d 86, 89 (N.J. Super. Ct. App. Div. 1984) (where statute required policy of group health insurance to state that "the insurer shall issue to the employer, the policyholder, or other person or association in whose name such policy is issued, for delivery to each

31

employee or member, a certificate setting forth in summary form a statement of the essential features of the insurance coverage . . . ." insurer had duty to issue copies of the certificate of insurance to employer, but no duty to provide copy of policy to each employee).

South Dakota law contains specific chapters for both group health and life insurance, but does not contain a separate chapter for group accident insurance. Accident insurance could fall into the definition of either health insurance or life insurance. Under South Dakota law, definitions of types of insurance are not mutually exclusive. SDCL § 58-9-1. South Dakota law provides:

> "Health insurance" is insurance of human beings against **bodily injury, disablement, or death by accident or accidental means**, or the expense thereof, or against disablement or expense resulting from sickness, or childbirth, or against expenses incurred in prevention of sickness, or dental care, and every insurance appertaining thereto. Health insurance does not include workers' compensation insurance.

SDCL § 58-9-3 (emphasis supplied). Life insurance is also defined by statute:

> "Life insurance" is insurance on human lives. Life insurance includes also the granting of endowment benefits, additional benefits in event of **death or dismemberment by accident or accidental means**, additional benefits in event of the insured's disability, and optional modes of settlement of proceeds of life insurance. Life insurance does not include workers' compensation coverages.

SDCL § 58-9-2 (emphasis supplied).

Plaintiff cites to health insurance provisions under South Dakota law while defendant cites to life insurance provisions. Contrary to Mr. O'Daniel's assertion, both group health insurance and group life insurance may be issued to credit unions under South Dakota law. The health insurance provision relating to the authorization of association member and employee group insurance provides:

> Group health insurance may be under a policy issued to an **association, including a labor union, which shall have a constitution and bylaws and which has been organized and is maintained in good faith for purposes other than that of obtaining insurance**, insuring members, employees, or employees of members of the association for the benefit of persons other than the association or its officers or trustees. The term "employees" as used herein may include retired employees.

SDCL § 58-18-3 (emphasis supplied); <u>see also</u> S.D. ADMIN R. 20:06:42:01-:02 ("Credit unions formed pursuant to state or federal law are associations eligible for the issuance of group health insurance."). The life insurance provision relating to the group insurance for associations provides:

> A policy of group life insurance may be issued to an **association, which has been in existence for one or more years, and which has a constitution and bylaws, and which was not formed for the exclusive purpose of procuring insurance,** insuring at least one hundred members of the association for the benefit of persons other than the association or its officers.

SDCL § 58-16-30 (emphasis supplied). Group life insurance may be issued to associations to which a policy of group health insurance can be issued. SDCL § 58-16-3.1.

Whether Mr. O'Daniel's insurance was group health insurance or group life insurance, South Dakota law requires that the central entity–here BHFCU-- keep members informed about the insurance policy. For group health insurance, South Dakota law provides:

> Each such group health insurance policy shall contain in substance a provision that **the insurer will furnish to the policyholder for delivery to each employee or member of the insured group**, a statement in summary form of the essential features of the insurance coverage of such employee or member and to whom benefits thereunder are payable. If dependents are included in the coverage, only one statement need be issued for each family unit.

SDCL § 58-18-9. For group life insurance, South Dakota law provides in part:

> [A] policy of group life insurance shall contain a provision that **the insurer will issue to the policyholder for delivery to each person insured** an individual certificate setting forth a statement as to the insurance protection to which he is entitled, to whom the insurance benefits are payable, and the rights and conditions set forth in [relevant statutory provisions].

SDCL § 58-16-38.

Therefore, regardless of whether Mr. O'Daniel's AD&D coverage was under a group health insurance policy or a group life insurance policy, it was BHFCU's duty to communicate with him about changes in the identity of the insurance carrier and to deliver to Mr. O'Daniel copies of each certificate of insurance issued when the underlying policy was changed. See SDCL §§ 58-16-38, 58-18-9. These duties did not fall upon the various insurance companies which issued policies to BHFCU: AMEX, GECA, Fortis, or The

34

Hartford.  See id.  Mr. O'Daniel's arguments relating to carrier changes are discussed in detail below.

**D.      Breach of Contract Claim**

The parties agree that South Dakota law applies in this case.  See Secura Ins. v. Horizon Plumbing, Inc., 670 F.3d 857, 861 (8th Cir. 2012) ("State law governs the interpretation of insurance policies when federal jurisdiction is based on diversity of citizenship.").  Under South Dakota law, contract interpretation is a question of law.  Cornelius v. Nat'l Cas. Co., 2012 S.D. 29, ¶6, 813 N.W.2d 167, 169.  To prevail on his breach of contract claim, Mr. O'Daniel must show (1) an enforceable promise; (2) that defendant breached that promise; and (3) he suffered damages as a result of defendant's breach.  See Guthmiller v. Deloitte & Touche, LLP, 2005 S.D. 77, ¶14, 699 N.W. 493, 498.  Each party raises numerous arguments for and against entry of summary judgment on Mr. O'Daniel's breach of contract claim.  Each is discussed in turn below.

Both parties assert nuanced arguments relating to contract interpretation.  But before this court can consider whether Jane O'Daniel's injury was a covered loss under a particular contract, this court must determine *which* contract governs.  Mr. O'Daniel argues that the provisions of the AMEX/GECA policy control because that is the only policy for which he

received a certificate of insurance.  Alternately, asserting that The Hartford
assumed responsibility for the AD&D policy issued by Fortis, Mr. O'Daniel
argues that his loss is covered under the terms of the policy issued by Fortis.
The Hartford argues that it can only be held liable under the terms of the
contract it issued to BHFCU.  Because the AMEX/GECA, Fortis, and The
Hartford policies contain differing provisions relating to covered losses,[6] which
contract governs must be determined first.

---

[6] The AMEX clause relating to injury states:
"Injury" means bodily injury of an Insured Person which: (1) is
caused by an accident that occurs while the Policy is in force as to
the Insured Person; (2) results directly in loss insured by the Policy;
(3) creates a loss due, directly and independently of all other causes,
to such accidental injury; and (4) occurs in the manner and under
the circumstances described in the Descriptions of Hazards which
apply. Docket No. 61-1 at 3.

The Fortis clause relating to injury states:
INJURY means bodily Injury caused by accident.  The accident must
occur while the Covered Person's insurance is in force under this
Policy.  The Injury must be the direct cause of Loss and must be
independent of all other causes.  The Injury must not be caused by
or contributed to by sickness, illness, or disease.
Docket No. 60-1 at 30.

The Hartford clause relating to injury states:
The Hartford: Injury means bodily injury resulting directly from
accident and independently of all other causes which occurs while
the Covered Person is covered under the Policy. Loss resulting from:
a) sickness or disease, except a pus-forming infection which occurs
through an accidental wound; or b) medical or surgical treatment of
a sickness or disease; is not considered as resulting from injury."
Docket No. 57-5 at 173.

**1. Whether Carrier Changes Required Mr. O'Daniel's Signature**

Mr. O'Daniel argues that SDCL § 58-17-14 required his signature before any change in the identity of an insurance carrier could be effective.[7] Since he never signed a document authorizing a change in insurance carrier, he argues that the original AMEX policy provisions control his claim for AD&D benefits. In relevant part, SDCL § 58-17-14 ("Entire contract and change clauses required–signed acceptance required for endorsements") provides: "Any rider, endorsement, or application added to a policy, upon policy issuance, after the date of issue, or at reinstatement or renewal *which reduces or eliminates benefits or coverage* in the policy requires signed acceptance by the policyholder" (emphasis supplied).

Mr. O'Daniel argues that each change by BHFCU in the identity of the insurance carrier issuing the AD&D policy constituted a "rider" or "endorsement" because the change attempted to "reduce or eliminate benefits or coverage" under Mr O'Daniel's existing policy (he asserts all changes were to the AMEX policy). Docket No. 84 at 8 (citing Mid-Century v. Lyon, 1997 S.D. 50, ¶6, 562 N.W.2d 888, 890). Mr. O'Daniel asserts the difference in "injury" clauses in each policy after the AMEX policy amounts to a reduction in

---

[7] Originally Mr. O'Daniel cited to SDCL § 58-19-18, -19, and -21, but asserts that he meant SDCL § 58-17-14. See Docket No. 84 at 55-56.

benefits.  In <u>Mid-Century v. Lyon</u>, the South Dakota Supreme Court explained

the nature of endorsements:

> Our insurance code, SDCL tit 58 [sic], gives no definition of "restrictive endorsement."  Legal treatises and encyclopedias uniformly suggest, however, endorsements of any type in an insurance context are attached to policies and are not part of the policy proper.  For instance, a leading treatise on the subject states, "Insurers often seek to change the rights of parties under an existing insurance policy by issuing 'riders' or endorsements that are *designed to be attached to the original insurance policy provisions* which were previously sent or delivered to an insured.

<u>Lyon</u>, 1997 S.D. 50, ¶6, 562 N.W.2d 888, 890 (internal citations omitted,

emphasis in original).  The South Dakota Supreme Court concluded that

restrictive endorsements must be positioned on a separate page or be attached

to an insurance policy, "positioned in a separate, prominent place."  <u>Id.</u> at ¶9,

562 N.W.2d 891-92.

The Hartford asserts that SDCL § 58-17-14 is not applicable because the

changes to Mr. O'Daniel's AD&D insurance did not involve riders or

endorsements.  Docket No. 66 at 12-15.  The parties agree that GECA assumed

the AMEX policy.  The parties further agree that Fortis issued a wholly new

policy, separate and distinct from GECA.  The issuance of the Fortis policy was

not a rider or endorsement which changed Mr. O'Daniel's *existing* AMEX/GECA

policy.  The Fortis policy *replaced* the AMEX/GECA policy.  Likewise The

Hartford policy *replaced* the Fortis policy.  Furthermore, Mr. O'Daniel admits at

least The Hartford policy listed BHFCU, not Mr. O'Daniel, as the policyholder.

<u>See</u> Docket No. 56 at ¶74 & Docket No. 75 at ¶74.  Accordingly, SDCL § 58-17-14 did not require Mr. O'Daniel's signature to change carriers because the change in identity of the insurance carriers did not constitute a "rider" or an "endorsement" on the original AMEX policy.

### 2. Which AD&D Policy Applies

#### a. The AMEX/GECA Policy Does Not Apply

Mr. O'Daniel asserts that his claim is covered under the AMEX policy. Docket No. 84 at 28.  Mr. O'Daniel has not joined AMEX, GECA, Fortis, Progeny/Affinion, or BHFCU in this action, nor does he explain how he would enforce an AMEX policy against The Hartford.

The Supreme Court of New York rejected a similar argument.  <u>See</u> <u>McKiernan v. Hartford Life Ins. Co.</u>, 519 N.Y.S.2d 843 (N.Y. App. Div. 1987).  In that case, the plaintiff had a group accident and health insurance policy through his savings and loan association.  <u>Id.</u> at 844.  The policy, issued by Hartford, provided for five years of disability payments upon the occurrence of a loss.  <u>Id.</u>  In 1979, the bank unilaterally changed insurance carriers from Hartford to American Home.  <u>Id.</u> at 844-45.  Under the American Home policy, only one year of disability payments were provided upon the occurrence of a loss if the insured were over the age of 50 at the time the disability occurred.  <u>Id.</u> at 845.  In 1982, the American Home policy was transferred to American

Bankers.  Id.  In 1983, the plaintiff, aged 52, became disabled.  Id.  American

Bankers paid him disability benefits for one year.  Id.

The plaintiff then sued all three insurance companies and his savings

and loan, arguing that he should be given the full five years of disability

payments as promised under the original Hartford policy.  Id.  As to the final

insurer whose policy was in effect at the time the plaintiff became disabled, the

court refused to apply the earlier five-year provision from the Hartford policy

against this third insurer.  Id. at 845-46.  The court noted that the plaintiff had

been notified of the changeover from Hartford to American Home, and that the

plaintiff had made premium payments to American Home, then to American

Bankers, for some time before he suffered his disability.  Id. at 846.  Therefore,

summary judgment in favor of each of the insurers was proper, because the

plaintiff was only entitled to benefits as provided under the final policy of

insurance, which benefits had already been paid.  Id.

Mr. O'Daniel's attempts to distinguish the McKiernan decision are

unavailing.  He argues that the opinion rests on insurance regulations unique

to New York.  The McKiernan court discusses two New York insurance

regulations, but they are not determinative of the court's decision.  Id. at 845.

The first regulation required 31 days' notice to the plaintiff before a group

insurance policy could be canceled.  Id. (citing 11 NYCRR 185.5(h)).  The

defendants did not comply with the 31-day notice provision, but that did not

drive the outcome of the case–the court excused the noncompliance because the plaintiff was not prejudiced. Id. Likewise, the court discussed a second regulation that required upon cancellation of a group insurance policy that the plaintiff be given the opportunity to convert his group policy to an individual policy. Id. (citing 11 NYCRR 185.14(b)(1)). Again, the regulation was not complied with, and again the court excused the noncompliance because the plaintiff was not prejudiced. Id. Thus, the two New York insurance regulations discussed in McKiernan had no part in determining the outcome of the case. Id.

Here, as in McKiernan, although Mr. O'Daniel claims he was not notified of the change from AMEX/GECA to Fortis, and from Fortis to The Hartford, there is no contractual basis for applying the AMEX policy provisions against The Hartford. Mr. O'Daniel agrees that when he completed the the Coverage Increase Request form on November 12, 2002, Fortis was the insurance carrier of the policy. See Docket No. 56 at ¶56 & Docket No. 75 at ¶56; 57-1 at 25:19-20 ("Well, it was Fortis at that time, I believe. That's who I thought was the holder of the policy.").

Even if he denies receiving documents relating to the GECA-to-Fortis conversion, Mr. O'Daniel understood at the time he made his coverage increase request that Fortis—not AMEX or GECA—was the insurer of his AD&D policy. Like the plaintiff in McKiernan, after he was on notice of the change,

41

Mr. O'Daniel continued to make premium payments for a number of years, first to Fortis, then to The Hartford. Mr. O'Daniel cannot continue to assert that the AMEX/GECA policy applies when he filled out the Coverage Increase Request form under the Fortis policy and knew that Fortis was his insurer in 2002. See McKiernan, 519 N.Y.S.2d at 845-46.

Thus, having eliminated the possibility of applying the provisions of the AMEX policy, the court must determine whether the Fortis policy controls, or whether The Hartford policy controls. Mr. O'Daniel's concession that he knew Fortis was the insurer at least as of the date he made his request for increased coverage (November 12, 2002), eliminates the possibility that the AMEX/GECA policy is still in play.[8]

---

[8]Ms. Head, director of insurance products for Affinion (the third-party agent of both BHFCU and its insurance carriers), stated that the coverage increase request form was included as a tear-off part at the bottom of the letter notifying BHFCU members of the switch in insurance carriers from GECA to Fortis. See Docket No. 60 at ¶19; Docket No. 53-20. Mr. O'Daniel cut off the bottom of the letter and returned the coverage increase request form, seeking to increase coverage from $10,000 to $200,000. See Docket No. 53-21. The request for coverage increase clearly stated that it was a request to Fortis. Id. Therefore, the conclusion seems inescapable that Mr. O'Daniel received the letter notifying him of the conversion from GECA to Fortis because the letter was on the same sheet of paper as the coverage increase request form. Compare Docket No. 53-20 with Docket No. 53-21.

**b. Mr. O'Daniel's Failure to Receive Notification of the Fortis-to-The Hartford Conversion or a Certificate of Insurance on The Hartford policy**

Mr. O'Daniel denies receiving documents relating to the conversion from Fortis to The Hartford. Mr. O'Daniel does not rely on his failure to receive the conversion documents, including a certificate of insurance, as a basis of summary judgment, because he advances the alternate argument that his signature was required for all carrier changes. As discussed above, this argument fails. Because the AD&D policy was a group policy, not an individual policy, BHFCU had the power to change insurance carriers and it was not required to obtain Mr. O'Daniel's signature before doing so. Also, as discussed above, the institution of a new insurance carrier each time did not constitute a "rider" or "endorsement" on the original AMEX policy, so again, Mr. O'Daniel's signature was not required to make these changes.

In his response to defendants' statement of material facts, Mr. O'Daniel states: "The record as a whole creates, at a minimum, an issue of fact as to whether the documents were mailed to him." Docket No. 75 at ¶¶63-64. Whether Mr. O'Daniel received Fortis-to-The Hartford conversion documents, including a new certificate of insurance, is not material to Mr. O'Daniel's claim against The Hartford, although it certainly would be material to a claim against BHFCU. As discussed above, delivery of either a summary or certificate is required for both group health and group life insurance under South Dakota

43

law, *but it is BHFCU that bore the responsibility to deliver these documents to Mr. O'Daniel, not Fortis or The Hartford.* <u>See</u> SDCL §§ 58-16-38, 58-18-9. Therefore, The Hartford cannot be held liable for BHFCU's failure to notify Mr. O'Daniel that it was changing carriers from Fortis to The Hartford.

### c.    The Training Kit was Not a Contract

Mr. O'Daniel asserts that Progeny/Affinion, as an agent of The Hartford, made certain promises in the training kit and that he was an intended third-party beneficiary of those promises. Setting aside for the moment the fact that Mr. O'Daniel could never have known of these "promises" because he denies receiving the training kit, this argument nonetheless fails.

Under South Dakota law, "a contract made expressly for the benefit of a third person may be enforced by him at any time before the parties thereto rescind it." <u>Jennings v. Rapid City Regional Hosp., Inc.</u>, 2011 S.D. 50, ¶ 10, 802 N.W.2d 918, 921 (quoting SDCL § 53-2-6). Such a contract "must clearly show that [the contract] was entered into with the intent on the part of the parties thereto that such third party should be benefitted thereby." <u>Id.</u> (quoting <u>Sisney v. Reisch</u>, 2008 S.D. 72, ¶ 9, 754 N.W.2d 813, 817-18). However, a third party beneficiary contract must still fulfill the requirements of a contract.

The training kit is found at Docket No. 53-23. It is basically a set of answers to "frequently asked questions" regarding the switch from Fortis to The

44

Hartford for BHFCU's AD&D insurance.  Several selections from that document

are reprinted below:

> Q.  Does this [AD&D] policy cover on-the-job accidents?
> A.  Yes.  The coverage is effective 24 hours a day, worldwide. (Subject to certain exclusions which are explained in the Certificate of Insurance).
>
> \* \* \*
>
> Q.  I bought additional coverage, and I got something called "added benefits."  What does this mean?
> A.  You automatically receive six added benefits that are included with your insurance.  (1) Common Carrier Accidental Death: Pays twice the face value of your additional coverage.  (2) Educational Assistance:  Pays a benefit to each dependent child who is enrolled as a full-time student in an Institution of higher learning.   (3) Anti-Inflation:   After two years of continuous coverage, benefit increases a specific percentage until it reaches 125% of the original amount.  (4) Hospital Income Benefit: Pays 1% of the Voluntary Insurance benefit up to $2,500 a month for hospital stay for more than 7 days (starting within 30 days of accident as the result of a covered Injury).  (5) Day Care Benefit:  Pays 2% of the Voluntary Insurance benefit or $2,000 (whichever is less) each year for two years, for each Eligible Dependent (under age 14 at the time of your death) who is enrolled in a Day Care Program.  (6) Adaptive Home and Vehicle: Pays a benefit if a covered Insured requires their home and/or car to be adapted due to a covered loss up to $2,500.  Your Certificate of Insurance will explain all of the specifics of these added benefits (including exclusions, limitations and terms of coverage).
>
> \* \* \* \*
>
> Q.  Who is the underwriter for this Insurance? Are they reputable?
> A.  The Insurance is underwritten by The Hartford.  A.M. Best, a company that evaluates Insurance companies, gives The Hartford an A+ rating.

> ```
> *   *   *   *
> ```
>
> Q.    Why is this conversion taking place?
>
> A.    Progeny continually evaluates the value of the programs it
>       markets to its credit unions and their members.    After
>       reviewing the programs underwritten by Fortis, and analyzing
>       an offer from The Hartford to upgrade the program, Progeny
>       determined the best overall value would be achieved by moving
>       this business to The Hartford.    We believe the change will
>       increase the value of the AD&D program to the members of our
>       credit union clients.

See Docket No. 53-23, pages 4, 5.

Mr. O'Daniel relies selectively on key words and phrases in the above

training kit to support his third-party beneficiary argument.  For example, he

states that Progeny's assertion that the changeover from Fortis to The Hartford

constitutes an "upgrade" and "the best overall value" constitutes a promise that

the coverage for losses under The Hartford policy will be at least as good, if not

better than, the coverage for losses under the Fortis policy.  Thus, argues

Mr. O'Daniel, if a loss was covered under the Fortis policy, it must be covered

under The Hartford policy as well by virtue of this third-party-beneficiary

"promise."

The case relied upon by Mr. O'Daniel does not support his assertion.  In

Farmers Mut. Auto. Ins. Co. v. Bechard, Mr. Bechard bought an automobile

insurance policy for his truck, which he used commercially.  Farmers Mut.

Auto. Ins. Co. v. Bechard, 80 S.D. 237, 239, 122 N.W.2d 86, 87 (1963).  The

policy included an endorsement in which the insurance company agreed to pay

a death benefit if the insured died "by accident while in or upon or while entering into or alighting from, or through being struck by, an automobile." Id. The insurance policy excluded coverage for death "sustained in the course of his occupation by any person while engaged (1) in duties incident to the operation, loading or unloading of, or as an assistant on, a public or livery conveyance or commercial automobile." Id. The policy defined "commercial automobile" as "a motor vehicle of the truck type." Id.

A circular issued by the insurance company described the death benefit in its policy by stating that "cash payments can be obtained for Death . . . resulting from accidents received while riding in *any* car or when struck by a car." Id. at 91, 122 N.W.2d at 247. The circular directed readers to see their insurance agent for complete information. Id. Mr. Bechard's insurance agent who sold the insurance policy to him explained the death benefit in a letter as follows: "it covers you regardless of what you are driving . . ." Id. at 87, 122 N.W.2d at 240.

Mr. Bechard then died in the course of his employment and occupation while hauling gravel with the commercial truck insured under his policy. Id. The insurance company denied coverage due to the exclusion for death occurring while one was engaged in one's occupation incident to the operation of a commercial automobile. Id. at 87-88, 122 N.W.2d at 240-41. The court held that the insurance company was estopped from denying coverage because

of the statements made by it in its circular and by its agent in the letter.  Id. at 92-93, 122 N.W.2d at 249-50.

Of course, the promises in Bechard were very specific:  you are covered under the death benefit if you die in an accident in *any* motor vehicle.  Id. at 87, 91, 122 N.W.2d at 240, 246-47.  Here, Progeny's statements are much less specific and they are qualified.  "We *believe*" that the change from Fortis to The Hartford will increase the "overall value" of the AD&D policy to members of BHFCU.  The only specific promises that were made were that six additional benefits would be made available under The Hartford policy and that the amount of benefit and the designation of beneficiary from the Fortis policy would carry over to The Hartford policy.  Mr. O'Daniel does not assert herein that The Hartford failed to honor these very specific representations as to coverage which were made in the training kit.

The Restatement (Second) of Contracts states that "[a] promise must be distinguished from a statement of opinion or a mere prediction of future events."  Restatement (2d) Contracts, § 2, cmt. f.  An opinion or prediction is not enforceable as a contract promise.  Id.  See also In re Estate of Eberle, 505 N.W.2d 767, 770 (S.D. 1993) (contract "must be sufficiently definite to enable a court to give it an exact meaning.").  If a statement is "indefininte, vague, and uncertain" it is not enforceable as a contract.  Deadwood Lodge No. 508, Benev. & Protect. Order of Elks v. Albert, 319 N.W.2d 823, 826 (S.D. 1982).

48

In the Albert case, the court found unenforceable the parties' statement that they would negotiate "a mutually acceptable monthly rental," where, after negotiating in good faith, the parties could not agree on a rental price. Id. Likewise, a statement that "you can rest assured we will have an unending supply of remnants" was held to be an unenforceable prediction or opinion with regard to a company's supplying of remnants. Major Mat. Co. v. Monsanto Co., 969 F.2d 579, 582-83 (7th Cir. 1992).

The court finds likewise here: Progeny/Affinion's statement that The Hartford policy was an "upgrade" or an increased "overall value" over the Fortis policy is not sufficiently specific to be an enforceable promise. It certainly did not amount to a promise that the coverage terms of The Hartford policy would be at least as favorable in all respects as the coverage terms of the Fortis policy. Even though the coverage terms of the Fortis policy may have been less favorable to an insured, the addition of the six additional benefits may still have supported a conclusion that The Hartford policy represented an "overall" better value. The court rejects Mr. O'Daniel's argument that the training kit created a contract of which he was the intended third party beneficiary.

### d. The Mailbox Rule is Not Material to the Breach of Contract Claim

The Hartford asserts that Mr. O'Daniel was provided new certificates of insurance relating to the Fortis-to-The Hartford transition. Docket No. 66 at

18-20.  The Hartford asserts that Progeny/Affinion records confirm that the conversion documents were sent to Mr. O'Daniel's correct address by Vertis, the third party administrator's print vendor.  The Hartford relies on a presumption that a properly mailed document was received by the recipient.  Id. at 19 (citing Davis v. Bancorp, 383 F.3d 761, 766 (8th Cir. 2004); Cox v. Brookings Int'l Life Ins. Co., 331 N.W.2d 299, 301 (S.D. 1983)).

There is probably a fact question as to whether the presumption can apply here.  First, the presumption is only a rebuttable presumption.  Cox, 331 N.W.2d at 301.   Second, there is a distinction between attesting to the company's normal procedures for sending out notices and attesting to the fact that those procedures were actually followed in the case of a particular intended recipient of the notice.  Crotty v. Dakotacare Admin. Servs., Inc., 455 F.3d 828, 830-31 (8th Cir. 2006).

Here, Mr. O'Daniel not only asserts that he did not receive the documents Vertis was supposed to have sent him, but he also attested to the normal procedure he follows when receiving important mail, and to the fact that his records showed he did not receive the Vertis mailing.  Docket No. 57-1 at 5 [Depo. 13-15].  This is probably enough to rebut the presumption of receipt and create a fact question.  Crotty, 455 F.3d at 831.

But in addition, The Hartford's evidence really only amounts to proof that the normal operating procedure would have included a mailing to Mr. O'Daniel

at his correct mailing address.[9]  No one from The Hartford, Progeny/Affinion, or

Vertis can actually say that they saw a properly addressed, stamped envelope

be physically placed in a mail receptacle and sent to Mr. O'Daniel.  As such,

the presumption of mailing is not invoked.  Crotty, 455 F.3d at 831.  Although

the parties dispute this genuine issue of fact, it is not material to the outcome

of the pending summary judgment motions.  "Only disputes over facts that

might affect the outcome of the suit under the governing law will properly

---

[9]To notify insureds of the Fortis-to-The Hartford conversion, Progeny (later Affinion) prepared a "conversion package" to credit union members.  For BHFCU members, the conversion package included a letter from BHFCU's president notifying credit union members of the conversion from Fortis to The Hartford.  A copy of The Hartford's AD&D insurance certificate was also included.  Progeny created a database containing the names, addresses, and other pertinent information of the credit union members enrolled in the AD&D program.  Progeny then sent this database file to Vertis Communications, its print vendor at the time.  Vertis was to send the conversion package to credit union members.

Jennifer Head, Director of Insurance Products at Affinion, submitted an affidavit detailing Vertis' procedures.  Docket No. 60 at ¶¶23-32.  Ms. Head stated:  "The Artemis computer screen bearing the code CSR5152, entitled Coverage Fulfillment History, constitutes confirmation that Mr. O'Daniel was included in the mailing."  Id. at ¶31.  This screen entry, dated October 16, 2005, is attached to Ms. Head's affidavit.  Docket No. 60-1 at 5.  Ms. Head asserts that another computer screen entry from the same date specifying "Fortis to Hartford conversion" means that Mr. O'Daniel was notified that his policy was being converted.  Docket No. 60 at ¶32, 60-1 at 7.  In her deposition, Ms. Head estimated that her company has been involved in thousands of carrier conversions.  Docket No. 61-9 at 3 [Depo. 15:14-15].  The BHCFU conversion from Fortis to The Hartford does not stand out in her mind, but she stated that she could verify that conversion packages were sent by the print vendor by using the Artemis system.  Id. at 4, 5 [Depo. 19:4-20; 26:16-27:20].

preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." <u>Anderson</u>, 477 U.S. at 248. (Moved this)

As discussed above in the context of group insurance, it is BHFCU (or its third-party administrators) who had the duty to inform Mr. O'Daniel of carrier changes, not The Hartford. <u>See</u> SDCL §§ 58-16-38, 58-18-9. It is also BHFCU which had the statutory duty to deliver to Mr. O'Daniel his certificate of insurance or a summary thereof under The Hartford policy. <u>Id.</u> If Mr. O'Daniel had sued BHFCU and the third-party administrators, his denial of receipt of the conversion package may or may not have been sufficient to rebut a presumption of mailing at trial, if one applies.

The Hartford did not purchase Fortis' AD&D policies in 2001. The Hartford was not responsible for notifying Mr. O'Daniel of changes to his AD&D insurance. Mr. O'Daniel can therefore only enforce against The Hartford the provisions of The Hartford's own policy. <u>McKiernan</u>, 519 N.Y.S.2d at 845-46. Any liability for the failure to notify him of the conversion or the failure to deliver a certificate of insurance must be directed to the party which had the statutory duty to carry out those tasks–BHFCU or its third-party administrators. <u>See</u> SDCL §§ 58-16-38, 58-18-9.[10]

---

[10]The Hartford cites <u>Swanson v. Sioux Valley Empire Elec. Assn. Inc.</u>, 535 N.W.2d 755, 758 (S.D. 1995), for the proposition that BHFCU did not owe a fiduciary duty to Mr. O'Daniel. But <u>Swanson</u> does not stand for that broad proposition. Rather, the <u>Swanson</u> court rejected a claim by a plaintiff insured

### 3. Whether Jane's Death is Covered Under The Hartford Policy

### a. Specific Provisions of The Hartford's Policy

The Hartford AD&D policy issued to BHFCU is found at Docket No. 57-5. The policyholder is BHFCU. See Docket No. 57-5 at 172. The policy covers all members of BHFCU who are 18 or over and who were covered under the Prior Policy's (i.e. Fortis') Voluntary Plan of Accidental Death and Dismemberment Coverage prior to the effective date of the Hartford Policy. Id. at page 161. The Hartford policy covers each prior covered person from the Fortis policy for the same benefit amount and the same beneficiary designation. Id. Mr. O'Daniel's wife was covered under the policy at the rate of 60 percent of the benefit amount applicable to Mr. O'Daniel. Id. at page 164.

Premiums for the basic plan of $1,000 in benefits were paid by BHFCU. Id. at 165. Premiums for "voluntary plans"–i.e. amounts over and above the $1,000 basic coverage–are to be paid to The Hartford by BHFCU, which in turn collects the premiums from the insured persons. Id. Alternatively, BHFCU can

---

under a group health policy that his group policyholder had superior experience, expertise, and bargaining power to select health insurance and, therefore, the group policyholder had a duty to procure "the best possible health" insurance for the plaintiff. Id. The court, however, stated that the group policyholder "must respect the rights of the insureds" under its group policy. Id. Certainly, the court would recognize the duty imposed on BHFCU by statute, even if not under a theory of a fiduciary relationship.

arrange for a third party, with mutual agreement of The Hartford, to collect the premiums from insured persons and remit them to The Hartford.  Id.

Under the terms of the policy, The Hartford supplies certificates of insurance to BHFCU for distribution to its insured members.  Id. at 166. Alternatively, BHFCU can arrange for a third party, with the mutual agreement of The Hartford, to take delivery of the certificates of insurance from The Hartford and to send them to insured persons under the plan.  Id.

The Hartford policy provided the following coverage:  "If a Covered Person's Injury results in any of the following losses within 365 days after the date of accident, We will pay the sum stated opposite the Loss shown in the Loss Table."  Id. at 174.  Following this provision is a chart showing various payments for death and various amputations or loss of sight, voice, or hearing. Id.

"Injury" as used in describing the coverage in the policy is a defined term under the policy.  In the "Definitions" section of the policy, "injury" is defined as follows:

> **Injury** means bodily injury resulting directly from accident and independently of all other causes which occurs while the Covered Person is covered under the Policy.  Loss resulting from:  a) sickness or disease, except a pus-forming infection which occurs through an accidental wound; or b) medical or surgical treatment of a sickness or disease; is not considered as resulting from injury.

Id. at 173.

The policy also contains a number of exclusions from coverage.  Id. at 174.  For example, loss occurring as a result of suicide or while committing a felony is excluded from coverage.  Id.  Injury sustained in war or while being employed full-time in the armed forces is excluded.  Id.  The policy also includes the following prescription drug exclusion:

> The Policy does not cover any Loss resulting from:  . . .  6.  Injury sustained while voluntarily taking drugs which federal law prohibits dispensing without a prescription, . . . **unless the drug is taken as prescribed or administered by a licensed physician**;

Id.  (emphasis supplied).

The parties' disagreement in interpreting The Hartford policy centers on the definition of "injury."  The Hartford argues that Jane O'Daniel died as a result of using a fentanyl patch, and that that patch constituted medical treatment of a sickness or disease, namely Jane's chronic pain condition following her accident.  Mr. O'Daniel argues that Jane's chronic pain condition was not the cause of her death–it was not and could never be a fatal condition.  He argues that the malfunction of Jane's fentanyl patch was an "accident" and, as such, is an "injury" under the policy.[11]  There is a split in the authorities when interpreting insurance provisions identical or similar to The Hartford's

---

[11]The parties quibble over whether the level of fentanyl in Jane O'Daniel's blood at the time of her death was a "therapeutic" level or a "toxic" level.  This dispute is not material, for both parties agree that, whatever the level of fentanyl is characterized as, Jane died as a result of the fentanyl in her system.

provisions.  The South Dakota Supreme Court has never interpreted insurance

provisions substantially similar to The Hartford's provisions.

      **b.**    **Basic Principals of Contract Interpretation Under South Dakota Law**

The interpretation of a contract is a question of law for the court to

determine.  Lillibridge v. Meade School Dist. #46-1, 2008 S.D. 17, ¶ 9, 746

N.W.2d 428, 431.  When interpreting a contract, "effect will be given to the

plain meaning of its words."  In re Dissolution of Midnight Star, 2006 S.D. 98,

¶ 12, 724 N.W.2d 334, 337.  Courts must "give effect to the language of the

entire contract and particular words and phrases are not interpreted in

isolation."  Id. (internal citation omitted).  When provisions of a contract

conflict, the more specific provision controls the more general provision.

Spiska Eng'g, Inc. v. SPM Thermo-Shield, Inc., 2007 S.D. 31, ¶ 21, 730 N.W.2d

638, 645.  Courts look "to the language that the parties used in the contract to

determine their intention."  Pauley v. Simonson, 2006 S.D. 73, ¶ 8, 720 N.W.2d

665, 667-68.  "When an insurer seeks to invoke a policy exclusion as a means

of avoiding coverage, the insurer has the burden of proving that the exclusion

applies."  Ass Kickin Ranch, LLC v. North Star Mut. Ins. Co., 2012 S.D. 73, ¶ 9,

822 N.W.2d 724, 727 (internal citation omitted).  The insurance policy must be

interpreted to give effect to each provision in the policy, and no single provision

should be construed in isolation.  Prokop v. North Star Mut. Ins. Co., 457 N.W.2d 862, 866 (S.D. 1990).

If the language of the contract is clear and unambiguous, the terms "it is the duty of [the] Court to declare and enforce it." Pauley, 2006 S.D. 73, ¶ 8, 720 N.W.2d at 668.  However, if the contract is ambiguous, then "parol and extrinsic evidence may be utilized 'to show what [the parties] meant by what they said . . .'" Id.  (quoting Jensen v. Pure Plant Food Internatl., Ltd., 274 N.W.2d 261, 264 (S.D. 1979)).  "[A]n insurance policy is ambiguous when it is fairly susceptible to two constructions." Fall River Co. v. South Dakota Public Assur. Alliance, 2001 S.D. 40, ¶ 6, 623 N.W.2d 735, 737.  If an insurance contract is ambiguous, it is construed liberally in favor of the insured and strictly against the insurer.   Ass Kickin Ranch, LLC, 2012 S.D. 73, ¶ 9; 822 N.W.2d at 727; Pete Lien & Sons, Inc. v. First American Title Ins., Co., 478 N.W.2d 824, 827 (S.D. 1991).  This is because the "language employed is that of the company and it is consistent with both reason and justice that any fair doubt as to the meaning of its own words should be resolved against it." Mut. Life Ins. v. Hurni Packing Co., 263 U.S. 167, 174 (1923).  However, the court may not seek out a "strained or unusual meaning for the benefit of the insured." Chord v. Reynolds, 1999 S.D. 1, ¶ 14, 587 N.W.2d 729, 732.  Where there is no ambiguity, however, like any other contract, an insurance policy is

construed according to the plain and ordinary meaning of its words.  Pete Lien & Sons, Inc., 478 N.W.2d at 827.

Other states have, at times in the past, recognized a doctrine of "reasonable expectations," although the popularity of that doctrine has declined in recent decades.  See 1 APPLEMAN, § 5.05[1].  The doctrine of reasonable expectations provides "that the objectively reasonable expectations of the insured at the time of application and the intended beneficiaries regarding the terms of the insurance contract must be given effect, despite policy provisions that would negate those expectations."  American Family Mut. Ins. Grp. v. Kostaneski, 2004 S.D. 114, ¶ 18, 688 N.W.2d 410, 414 (citing Alverson v. Northwestern Nat. Cas. Co., 1997 S.D. 9, ¶ 13, 559 N.W.2d 234, 236 (citing Dairyland Ins. Co. v. Wyant, 474 N.W.2d 514, 516 (S.D. 1991))). The reasonable expectations doctrine has never been the declared law in South Dakota, but neither has the South Dakota Supreme Court ruled it out. Kostaneski, 2004 S.D. 114, ¶¶ 18-19, 688 N.W.2d at 414.  Like the rule of strict construction against the insurance company, the doctrine of reasonable expectations applies only when the court first finds that the contract is ambiguous.  Id. at ¶ 19.

Where the cause of death is not in dispute, it is purely a question of law for the court to decide whether the death resulted from a cause insured against

under an AD&D insurance policy.  <u>Grobe v. Vantage Credit Union</u>, 679 F.

Supp. 2d 1020, 1030 (E.D. Mo. 2010).

<p style="text-align:center;">**c.      There is No Controlling South Dakota Case Law**</p>

Mr. O'Daniel relies on <u>Wolfe v. Order of United Commercial Travelers of

Amer.</u>, 70 S.D. 452, 18 N.W.2d 755 (1945), as controlling South Dakota law in

interpreting The Hartford's policy in this case.  In the <u>Wolfe</u> case, the South

Dakota Supreme Court interpreted an AD&D policy to provide coverage when

the insured died as a result of a sudden and unexpected reaction to the

administration of anesthetic in preparation for a surgery.  <u>Id.</u> at 454, 463, 18

N.W.2d at 756, 760.  The <u>Wolfe</u> decision is not controlling for at least two

reasons.

First, because the court was interpreting a policy issued to the insured

from a fraternal benefit association in Ohio, the court exclusively applied Ohio

contract law in interpreting the policy.  <u>Id.</u> at 458-61, 18 N.W.2d at 758-59.

Therefore, the court's reasoning and holding are based on an analysis of Ohio

law, not South Dakota law.  It is true, as Mr. O'Daniel points out, that the

court stated in *dicta* that Ohio law did not conflict with South Dakota law as to

this issue.  <u>Id.</u> at 459, 18 N.W.2d at 758.  However, even though the <u>Wolfe</u>

decision has been cited by subsequent South Dakota cases, its holding as to

the interpretation of the insurance contract has never been cited as controlling

precedent in any subsequent South Dakota case.

<p style="text-align:center;">59</p>

The second reason the <u>Wolfe</u> decision is not controlling precedent is because the insurance provision being interpreted by the <u>Wolfe</u> court was demonstrably different than the two key provisions in The Hartford's policy which is at issue here.  The policy provision construed in <u>Wolfe</u> insured against "bodily injuries effected through external, violent and accidental means."  <u>Id.</u> at 454, 18 NN.W.2d at 454.  The court decided the issue whether the introduction of the anesthetic needle and medicine into the decedent's skin was an external, violent and accidental means of death.  <u>Id.</u>  There was no requirement in the <u>Wolfe</u> policy that the cause of the injury "result[] directly from accident and independently of all other causes."

At the very end of the <u>Wolfe</u> decision, the court stated, "[t]hese conclusions [that the death was the result of external, violent and accidental means] preclude the theory that the death of insured resulted from medical or surgical treatment, or from the intentional taking of medicine or drugs."  <u>Id.</u> at 463, 18 N.W.2d at 760.  However, the court never indicates whether this statement or language comes from the insurance policy being interpreted or where the language comes from.  <u>Id.</u>  The <u>Wolfe</u> decision is just not an indication of how the South Dakota Supreme Court would interpret The Hartford policy provisions.

There is another reason the court finds the <u>Wolfe</u> decision less than persuasive.  The case had a tortuous history, which is fully set forth in the

United States Supreme Court opinion reversing the South Dakota Supreme Court. The insured was a Mr. Ford Shane and his mother, Elizabeth Shane, was the beneficiary under the policy. <u>Order of United Commercial Travelers of America v. Wolfe</u>, 331 U.S. 586, 590, 595 (1947). Upon Ford's death, Mrs. Shane filed a complaint against the insurance company in South Dakota state court. <u>Id.</u> at 597. The insurance company then removed the case to the federal district court for the District of South Dakota based on diversity jurisdiction. <u>Id.</u> There, the district court judge ruled in Mrs. Shane's favor on the issue of coverage, and the insurance company appealed the ruling to the Eighth Circuit. <u>Id.</u>

The Eighth Circuit reversed, holding that Ford's death was ***not*** the result of "bodily injury . . . effected through external, violent, and accidental means," and, further, the court ruled that Ford's death was excluded from coverage under a provision excepting coverage for loss resulting from medical treatment. <u>Order of United Commercial Travelers of Amer. v. Shane</u>, 64 F.2d 55, 58-60 (8th Cir. 1933). The <u>Shane</u> decision is not binding precedent either because its holding, like <u>Wolfe</u>, is also not premised on South Dakota law. <u>Id.</u> at 58-60.[12]

It is a testament to the ingenuity, persuasiveness, and tenacity of the plaintiff's attorney, Mr. Hub Fellows, that, following the Eighth Circuit's ruling

---

[12]Curiously, the <u>Shane</u> court did not base its decision on Ohio law, as the South Dakota Supreme Court did in <u>Wolfe</u>. <u>See</u> <u>Shane</u>, 64 F.2d at 58-60.

against him, he was able to refile his case in South Dakota state court and convince the state courts to rule on the exact same coverage issue that had been presented to the Eight Circuit and to reach an opposite result in Wolfe, without being derailed by the doctrine of *res judicata*. The United States Supreme Court ultimately ended the litigation by overruling the South Dakota Supreme Court on an issue related to the six-month statute of limitations contained in the insurance policy. Wolfe, 331 U.S. at 625.[13] The Wolfe decision by the South Dakota Supreme Court is as much binding precedent on the insurance contract issue as the Shane decision is, and they both point in opposite directions. The court declines to give further life to a case that has already lived a lengthy, varied, and colorful life. Let the Wolfe decision now rest in peace.

---

[13]The Hartford argues that, because the United States Supreme Court reversed the Wolfe court on its holding that the action was not time-barred, the Supreme Court held that the South Dakota court should never have reached the merits of interpreting the contract. For that reason, The Hartford argues that the part of the Wolfe decision interpreting the merits of the contract is no longer good law. This raises a number of issues, not the least of which is whether federal law or state law should determine the continuing validity of a South Dakota Supreme Court case reversed by the highest federal court in the country. The court declines to resolve this issue because it is unnecessary to the resolution of the pending motions.

### d. There is a Split of Authority Among Other Jurisdictions Interpreting the Same or Similar Insurance Provisions

First, it is important to narrow the field of what the parties really dispute here.  No one disputes that Jane O'Daniel suffered from chronic pain.  No one disputes that her doctor prescribed a fentanyl patch for Jane to address her chronic pain.  No one disputes that Jane died when the levels of fentanyl in her body became toxic.  Why this happened is not exactly clear, though the fact that Jane had been using fentanyl patches for some years gives rise to an inference that the patch itself was faulty in some way–if she had had an idiosyncratic susceptibility to fentanyl per se, that susceptibility would have shown itself many years earlier.  Mr. O'Daniel entered into a confidential settlement agreement with the manufacturer of the fentanyl patch that Jane used, so perhaps he is constrained from saying too much about the basis of the manufacturer's liability.  In any case, the parties agree that it was fentanyl, not Jane's chronic pain, that resulted in her death.  Her pain did not itself and directly carry fatal consequences.

The conclusion that Jane died as a result of fentanyl toxicity calls into question two separate provisions of The Hartford's policy to determine whether her death is covered under the policy.  The first provision is the definition of "injury" which excludes coverage for losses resulting from medical treatment.

The second provision is the exclusion for losses due to the taking of prescription drugs.

As to the former provision, "[m]edical and surgical treatment mean what is done by a physician . . . in diagnosing a bodily ailment and seeking to alleviate or cure it.  It includes the things done by the patient to carry out specific directions given for these ends by a physician."  Grobe, 679 F. Supp. 2d at 1031-32 (quoting Barkerding v. Aetna Life Ins. Co., 82 F.2d 358, 359 (5th Cir. 1936)).  See also Arrredondo v. Hartford Life and Accident Ins. Co., 860 F. Supp. 2d 363, 368 (S.D. Tex. 2012) (also quoting Barkerding).  Clearly, Jane's doctors prescribed fentanyl seeking to alleviate a bodily ailment, namely chronic pain.  Just as clearly, Jane's use of the patch was something she did to carry out specific directions given to her by her doctor for this end.  As such, the conclusion is inescapable that the fentanyl patch constituted "medical treatment."  Grobe, 679 F. Supp. 2d at 1031-32; Arredondo, 860 F. Supp. 2d at 368.  But cf. Smith v. Stonebridge Life Ins. Co., 582 F. Supp. 2d 1209, 1223-25 (N.D. Ca. 2008) (holding that prescribed use of oxycodone which had been prescribed for chronic pain and resulted in death was not excluded by "medical treatment" exclusion; however, that holding was based on a California statute, which the court held applied under the facts of that case instead of the policy provision).

The second provision called into question by the facts of Jane's death is the prescription drug exclusion. It bears repeating verbatim here:

> The Policy does not cover any Loss resulting from: . . . Injury sustained while voluntarily taking drugs which federal law prohibits dispensing without a prescription, . . . **unless the drug is taken as prescribed or administered by a licensed physician**;

See Docket No. 57-5, page 174 (emphasis added). As can be seen, the drug exclusion really consists of two parts. The first part states the exclusion: there is no coverage from a loss resulting from the voluntary taking of a drug for which federal law requires a prescription. The second part states an exception to the exclusion: losses *are* covered if they result from the taking of a prescription drug when it is taken as prescribed or administered by a doctor. An exception to an exclusion means that the loss is covered. Thus, under the prescription drug exclusion, if one takes a prescription drug without a prescription, or if one takes a prescription drug contrary to the doctor's directions in prescribing the drug, then any loss which occurs is not covered by the policy. But if one takes a prescription drug for which one has a prescription from one's doctor, and if one follows the doctor's advice in taking the drug, then the loss is covered–such loss is excepted from the exclusion. The gordian knot is: interpreting these two provisions (medical care exclusion and drug exclusion) together, is Jane's loss covered by The Hartford policy?

Courts which have construed these two policy provisions together (or substantially similar policy provisions) have split over whether there is coverage for a death occurring from taking a prescription drug as directed by a doctor.  In <u>Clark v. Metropolitan Life Ins. Co.</u>, the insured was prescribed two drugs for her anxiety and panic disorder, and was then prescribed a cough syrup containing Hydrocodone for acute bronchitis.  <u>Clark v. Metropolitan Life Ins. Co.</u>, 369 F. Supp. 2d 770, 772 (E.D. Va. 2005).  The insured died as a result of the interaction between her three prescription drugs.  <u>Id.</u>  The defendant's policy insuring the insured provided benefits for accidental death, but excluded coverage for any "physical or mental illness or . . . treatment for the illness."  <u>Id.</u> at 778.  The policy also excluded coverage for "the use of any drug or medicine, unless used on the advice of a licensed medical practitioner."  <u>Id.</u>

Reading the two provisions together, the <u>Clark</u> court held that interpreting the first exclusion for medical treatment as determinative of coverage would render the second clause of the drug exclusion–the exception from the exclusion, the "unless" clause–a nullity.  <u>Id.</u>  "If all deaths caused by treatment for illness were excluded [under the first exclusion], this would include deaths resulting from the use of medicine on the advice of a licensed medical practitioner where the medicine was prescribed to treat an illness."  <u>Id.</u>  This reading, the court held, clearly conflicted with the "unless" clause of the

66

drug exclusion.  Id.  Instead of interpreting the contract so as to render the

"unless" clause of the drug exclusion a nullity, the court gave meaning to both

terms by holding that death brought about by taking a prescribed medicine as

directed by a doctor was covered under the Met Life policy.  Id.  The Clark case

arose under the Employee Retirement Income Security Act ("ERISA"), so the

court applied federal common law to decipher the insurance contract.  Id. at

774-75.

The federal district court in the District of Idaho followed the Clark

court's reasoning, interpreting the identical two insurance provisions with

which this case is concerned.  See Ramsey v. Hartford Life Ins. Co., Civ. No.

4:12-cv-00527-BLW, Docket No. 20, 2013 WL 1693673 (D. Idaho Apr. 17,

2013), vacated on stipulation of the parties, Docket No. 38 (July 31, 2013).

The insured in that case, like Mr. O'Daniel here, had obtained an AD & D

policy through his credit union.  Id. at *1.  The Ramsey insured took

medications for a bipolar affective disorder, headaches, and also for chronic

flank pain.  Id.  She died as a result of an accidental overdose–either a toxic

cross-reaction between her medications, or because the delivery method of one

medication had recently been changed.  Id. at *2.

The Ramsey court, looking through the form to the substance of the

Hartford contract, held that the "medical treatment" provision was really an

exclusion, regardless of the label Hartford chose to put on it.  Id. at *6 (citing

67

<u>Black's Law Dictionary</u> 563 (6th ed. 1990) for the definition of "exclusion" as a provision that "eliminates [insurance] coverage where were it not for exclusion, coverage would have existed."). The court noted that Ms. Ramsey's death was an accident that would otherwise have been covered under the Hartford policy but for the "medical treatment" exclusion. <u>Id.</u> Construing the "medical treatment" provision with the "unless" clause from the drug exclusion, the court found an ambiguity was created: the "unless" clause would be rendered a nullity by interpreting the "medical treatment" clause to preclude coverage for death from prescribed medications as part of a medical plan of treatment. <u>Id.</u> at *7. Following <u>Clark</u>, the <u>Ramsey</u> court interpreted the ambiguity in favor of the insured and found coverage. <u>Id.</u>

The Appellate Court of Illinois for the Third District reached the opposite result in <u>Brown v. Stonebridge Life Ins. Co.</u>, 990 N.E.2d 895 (Ill. App. Ct. 2013). The Appellate Court is an intermediate appeals court in the Illinois state court system, immediately below the Illinois Supreme Court. The insured in <u>Brown</u>, like Jane O'Daniel, also suffered from chronic pain and was also prescribed a fentanyl patch by her doctor. <u>Id.</u> at 896-97. Like Jane, the insured in <u>Brown</u> also died from fentanyl intoxication, even though the insured had used the patch for several years and was using the patch as instructed by her doctor at the time of her death. <u>Id.</u>

The <u>Brown</u> court construed the same two provisions at issue in this case. <u>Id.</u> at 897-98. The <u>Brown</u> court held that the insured's death was not covered under the "medical treatment" provision. <u>Id.</u> at 901. The court interpreted the prescription drug exclusion to apply when one takes illegal drugs, or takes prescription drugs other than as prescribed by a doctor. <u>Id.</u> The court held that the "medical treatment" provision applied "on its own accord, without respect to the use of prescribed narcotics, and the drug exclusion for nonprescribed narcotic use is inapplicable." <u>Id.</u> at 713.

The <u>Brown</u> court's analysis only rings true if one ignores the "unless" clause in the drug exclusion. When would one ever take a prescription drug "as prescribed" if not for a sickness, disease, or other medical condition? Doctors are not in the business of prescribing controlled substances to perfectly healthy people–at least not reputable doctors. Since the only time one would be taking prescription medicine "as prescribed" is if one had an illness or disease one was medically treating, the "unless" clause of the drug exclusion conflicts with the medical treatment exclusion.

In <u>Grobe v. Vantage Credit Union</u>, the court construed the same exact policy provisions that are at issue in this case: a general exclusion for losses resulting from medical treatment (found in the definition of "injury"), and an exclusion for loss resulting from drug use, with an exception to the drug use exclusion for loss  resulting from taking a drug as prescribed by a doctor.

Grobe, 679 F. Supp. 2d at 1031. The insured in Grobe died as a result of accidental sustained acute methadone intoxication. Id. The insured had been prescribed methadone by his doctor for the treatment of a medical condition. Id. Like this court, as well as the Brown and Clark courts, the district court in Grobe found that the insured's death was as a result of "medical treatment," and thus fell within the first exclusion. Id.

The court then considered the interplay between the "medical treatment" definitional exclusion and the drug exclusion. Id. at 1031-33. The Grobe court found no inconsistency or conflict between the provisions, and held that the insured's death was not covered under the policy. Id. at 1031-34. However, it is clear that in doing so, the court believed that pain is not a "sickness" or "disease" within the meaning of the "medical treatment" provision. Id. The court gave the following lengthy example to explain under what circumstances the "unless" clause of the drug exclusion would still have application:

> For example, imagine two individuals covered under this policy each broke a bone in an accident. To deal with the pain from the break and surgery, both individuals then took a drug that, under federal law, cannot be dispensed without a prescription. Individual One went to the doctor to get the prescription. Individual Two took the medication from her friend, who had been prescribed the medication from a former accident. If both individuals died of overdoses, Individual One would be covered by this policy, and Individual Two would not. Both individuals suffered a loss under the definition of injury in the policy because they were taking the medication because of an accident, and not as "medical or surgical treatment of a sickness or disease." The prescription drug exclusion is triggered because both individuals took regulated drugs, and suffered an injury

70

> while doing so. Individual Two cannot collect on the policy because her injury was "sustained while voluntarily taking drugs" and she did not have a prescription. Individual One can collect, however, because, unlike Individual Two, she received a prescription for her drugs because of the original accident.

Id. at 1033. The Grobe court subsequently repeated its belief that the Hartford policy covered accidental death from taking "pain medication for an injury caused by an accident (covered)." Id. Thus, because the Grobe court conjured up a hypothetical situation it believed was covered by the "unless" clause of the drug exclusion–the taking of medicine for pain–the court concluded that there was no conflict between the provisions since each could be given effect under the hypothetical facts. Id. Because the insured in the Grobe case was taking methadone for insulin-dependent diabetes and/or depression instead of pain medication due to an accident, the court held that the insured's death was not a covered loss under the policy. Id. at 1034.

This court respectfully disagrees with the Grobe court's analysis. First, the court notes that the Grobe decision supports a finding that Jane O'Daniel's death is a covered loss under The Hartford's policy. She was taking pain medication because she had been in an accident that caused her pain. Even the Grobe court would hold that such a death is covered. See id. at 1033-34. However, the Grobe court's analysis is faulty because it ignores the pervasive and broad definition that courts have given to the phrase "medical treatment of a sickness or disease" under accidental death policies.

71

Medical treatment for a sickness or disease has been interpreted very broadly. It includes the use of a lightbulb by the insured to impart heat to his foot. Barkerding v. Aetna Life Ins. Co., 82 F.2d 358, 358-59 (5th Cir. 1936). It includes the use of a catheter to impart nourishment due to nutritional deficiency caused by Crohn's disease. Senkier v. Hartford Life & Accident Ins. Co., 948 F.2d 1050, 1051, 1053-54 (7th Cir. 1991). Death due to the use of opiates in the aftermath of surgery (presumably to address post-surgery pain) has been held to constitute "medical treatment for a sickness or disease." Wilson v. Business Men's Assurance Co. of America, 181 F.2d 88, 90 (9th Cir. 1950). And, of course, the Brown case recognizes that chronic pain is a sickness or disease. Brown, 990 N.E.2d at 900-01. See also Arredondo, 860 F. Supp. 2d at 365-69 (holding that insured's use of medication for chronic pain was "medical treatment for a sickness or disease"). Therefore, the Grobe court's assumption that pain from an accident is not a sickness or disease is not supported by the law.

Another case, Cady v. Hartford Life & Accident Ins. Co., followed the Grobe court's reasoning. See Cady v. Hartford Life & Accident Ins. Co., 10-CV-00276-EJL, 2013 WL 1001073, at *10 (D. Idaho Mar. 13, 2013). Interestingly, the Ramsey decision was issued by the same court as Cady and Ramsey declined to follow Cady, in part because Cady is an ERISA case and the court reviewed Hartford's denial of benefits on an abuse of discretion

72

standard rather than *de novo* as a matter of law.  See <u>Ramsey</u>, 2013 WL 1693673 at *7-*9; <u>see</u> <u>Cady</u>, 2013 WL 1001073, at *12-*14.

The court finds <u>Cady</u> distinguishable on this basis too, but also because the insured in <u>Cady</u> had taken four drugs which, in combination, caused his death.  <u>Cady</u>, 2013 WL 1001073, at *1.  The decedent had four times the therapeutic range of one drug in his system at the time of his death, a drug for which the insured had a prescription from a doctor.  <u>Id.</u>  He also had methadone in his system, a drug which is federally regulated and for which the insured had **no** prescription.  <u>Id.</u> at *1, 13.  The district court, in an alternative holding, held that the prescription drug exclusion applied because the insured had "voluntarily tak[en] drugs [methadone] which federal law prohibits dispensing without a prescription," while the insured had no prescription.  <u>Id.</u> at *13.  <u>See also</u> <u>Guin v. Fortis Benefits Ins. Co.</u>, 256 F. Supp. 2d 542, 546, 549 (E.D. Tex. 2002) (denying coverage under drug exclusion because the insured had died from the interaction of three prescription drugs, but he only had a prescription from a doctor for one of those three drugs).

Likewise, the <u>Arredondo</u> decision is distinguishable where the insured died as a result of a combination of:  toxic levels of one prescription drug, methadone; therapeutic levels of two other prescription drugs; and a blood alcohol level that "met all known legal definitions of intoxication under Texas law, . . ."  <u>Arredondo</u>, 860 F. Supp. 2d at 367-68, 370.  Interpreting the exact

same policy provisions as here, the court found that the insured's death was not a covered loss because it was excluded under the prescription drug exclusion.  Id. at 369-70.  Not only had the insured likely taken methadone in a manner contrary to his doctor's instructions, the doctors had repeatedly warned the insured not to drink alcohol with his medications, so the use of alcohol clearly was contrary to his doctor's instructions as to how the prescription medicine was to be taken.  Id. at 367, 369-70.[14]  Thus, the facts in Arredondo did not trigger the "unless" clause of the drug exclusion, which in this case sets up the ambiguity in the policy.

The court finds distinguishable the multitude of cases denying coverage for deaths related to the taking of prescription drugs under the "medical treatment" exclusion where the insurance policy in question does not also contain a drug exclusion with the "unless" exception.  See e.g. Raymond v. Life Ins. Co. of North Amer., 924 F. Supp. 2d 1345, 1349-1351 (S.D. Fla. 2010); Shane, 64 F.2d at 56 n.2, 58; Puig v. Citicorp Life Ins. Co., 687 So. 2d 852, 854-55 (Fla. Dist. Ct. App. 1997).  The conclusion of this court in this case hinges on the inconsistency and ambiguity created by the interplay between

_____

[14]The Arredondo court also held that the insured's death was not covered because the policy contained an exclusion for loss resulting from intoxication. Arredondo, 860 F. Supp. 2d at 370-71.  The court also concluded that the death resulted from "medical treatment" and was not, therefore, an "injury." Id. at 368-69.

the "medical treatment" exclusion and the "unless" clause of the drug

exclusion. Without the latter, this court would find no coverage because Jane

O'Daniel' use of fentanyl was clearly medical treatment for a sickness or

disease.[15]

This court is bound, in this diversity action, to apply the state law of

South Dakota to resolve the insurance policy interpretation issue. Erie R.R.

Co. v. Tompkins, 304 U.S. 64, 78 (1938); Secura Ins., 670 F.3d at 861. Where

there is no direct state court decision on point, this court must attempt to

predict how the state court would decide the issue, using decisions from other

jurisdictions as guides. Midwest Oilseeds, Inc. v. Limagrain Genetics Corp.,

387 F.3d 705, 715 (8th Cir. 2004). Here, there is no South Dakota law

interpreting the same or substantially similar insurance policy provisions.

However, South Dakota law does instruct this court's method of interpretation

_____

[15]The parties each cite many cases on the interpretation of
"independently of all other causes" and "resulting from." The court finds it
unnecessary to address these issues because the law is clear that the taking of
prescription medicine for chronic pain is "medical treatment of a disease or
sickness," which, standing alone, would place Jane's death outside of the
policy's coverage. Also, Mr. O'Daniel devotes substantial time and authority on
the accidental means/accidental ends argument, trying to convince the court
that Jane's death was "from accident." This line of argument presupposes that
the death from medical treatment is not "accident." The two are not mutually
exclusive. A death from medical treatment, including the taking of prescription
drugs, can be no less an accident than slipping on a soap bar. The fact of the
matter is that The Hartford chose to exclude loss resulting from medical
treatment, whether it is an accident or not.

of The Hartford policy: the court is to construe the contract so as to give effect to all the provisions, and any ambiguity is to be construed in favor of Mr. O'Daniel. <u>Ass Kickin Ranch, LLC</u>, 2012 S.D. 73, ¶ 9, 822 N.W.2d at 727; <u>Pete Lien & Sons, Inc.</u>, 478 N.W.2d at 827; <u>Prokop</u>, 457 N.W.2d at 866.

Here, The Hartford would have this court focus only on the definition of "injury" and its "medical treatment" exclusion and hold that Jane O'Daniel's death is not covered–The Hartford does not want the court to consider the prescription drug exclusion provision. But the court must construe the definition of "injury" *with* the drug exclusion, particularly the "unless" clause in the drug exclusion because the court is prohibited from focusing on one provision in isolation, and the court must read the contract as a whole, giving effect to all its provisions. <u>Prokop</u>, 457 N.W.2d at 866. This creates an ambiguity: the policy is "fairly susceptible to two constructions." <u>Fall River Co.</u>, 2001 S.D. 40, ¶ 6, 623 N.W.2d at 737. The medical treatment exclusion can be read to exclude coverage from death caused by prescription medications as part of one's medical treatment for a sickness or disease, while the "unless" clause of the drug exclusion can be read as creating coverage. The court notes that The Hartford was the master of the language chosen in this policy of insurance. It alone wrote the provisions. If The Hartford wanted to make clear that the taking of prescription medicine "as prescribed" was ***not*** a covered loss under its policy, The Hartford could have left out the "unless" clause from the

prescription drug exclusion.  It is not unfair to construe the ambiguity created

by the inclusion of the "unless" clause against The Hartford, because the

"language employed [in the policy] is that of [The Hartford] and it is consistent

with both reason and justice that any fair doubt as to the meaning of its own

words should be resolved against it."  Hurni Packing Co., 263 U.S. at 174.

Under these circumstances, the reading most favorable to Mr. O'Daniel

must be adopted.  Ass Kickin Ranch, LLC, 2012 S.D. 73, ¶ 9, 822 N.W.2d at

727; Pete Lien & Sons, Inc., 478 N.W.2d at 827.  Accordingly, the court holds

that Jane O'Daniel's death was a covered loss under The Hartford's policy

issued to BHFCU and under which Ms. O'Daniel was an insured.  The court

therefore recommends that Mr. O'Daniel's motion for partial summary

judgment on his contract claim be granted and that The Hartford's motion for

summary judgment on the contract claim be denied.

### 4.    Prejudgment Interest

Under South Dakota law, prejudgment interest is available by statute as

follows:

> Every person who is entitled to recover damages certain, or capable
> of being made certain by calculation, and the right to recover
> which is vested in him upon a particular day, is entitled also to
> recover interest thereon from that day, except during such time as
> the debtor is prevented by law, or by the act of the creditor, from
> paying the debt.

See SDCL § 21-1-11.

The "fundamental purpose [of prejudgment interest] is to do justice to one who has suffered a loss at the hands of another." South Dakota Bldg. Auth. v. Geiger-Berger Assoc., P.C., 414 N.W.2d 15, 19 (S.D. 1987). Prejudgment interest should be awarded only "when the amount payable can be readily ascertained by calculation, with reference to well-known standards of customary market values." Id. On the other hand, where the amount owed cannot be calculated with reasonable exactness, prejudgment interest may not be awarded. Id. Sometimes, a jury question is presented on the issue of prejudgment interest. Id. Where the defendant's liability is in question, the defendant cannot know the amount of plaintiff's damages until a jury sets the amount. Id.

Here, The Hartford's liability on its policy for Jane O'Daniel's death was very much in question, although the amount due under the policy if The Hartford *was* liable is certainly a firm figure which both parties could ascertain from the beginning. The split of authority in interpreting the two key provisions of The Hartford AD&D policy, along with the fact that there was no South Dakota law on point, left The Hartford's obligation to pay up under the contract unknowable until the court determined the answer. Under these circumstances, the court believes that a jury question is created as to Mr. O'Daniel's entitlement to prejudgment interest. Accordingly, the portion of

Mr. O'Daniel's motion for partial summary judgment asking for prejudgment interest is denied.

**E.     Bad Faith Claims**

To prove a bad faith cause of action against The Hartford, Mr. O'Daniel must show that The Hartford had no reasonable basis for denying his claim for insurance benefits, and that The Hartford acted with knowledge or a reckless disregard as to the lack of a reasonable basis for the denial of benefits.  See Sawyer v. Farm Bureau Mut. Ins. Co., 2000 S.D. 144, ¶ 18, 619 N.W.2d 644, 649.  Bad faith is an issue of fact for the jury.  Isaac v. State Farm Mutual Auto. Ins. Co., 522 N.W.2d 752, 758 (S.D. 1994).  The jury should determine whether the insurer acted in bad faith "based on the facts and law available to [the insurer] at the time it made its decision to deny coverage."  Id.

**1.     Count Two–Bad Faith**

Mr. O'Daniel asserts three counts of bad faith in his second amended complaint.  See Docket No. 47, pages 5-6.  Under the first count, he asserts that the AMEX/GECA policy provisions were the applicable provisions under which The Hartford should have evaluated Jane's death.  Id.  Because the AMEX/GECA policy did not include the medical treatment exclusion, Mr. O'Daniel asserts that The Hartford denied his claim in bad faith.  Id.  As discussed above, this claim must fail as a matter of law because the court has concluded as a matter of law that the AMEX/GECA policy has no application to

the claim for Jane's death. Summary judgment should be granted to The

Hartford on Count Two–Bad Faith, paragraphs 25-28, of Mr. O'Daniel's second

amended complaint.

### 2. Count Three--Bad Faith

The second claim of bad faith asserts that The Hartford wrongfully

denied coverage for Jane's death under the terms of its own policy. Id. This

claim of bad faith presents the question of first impression under South Dakota

law discussed at length above under section D.3. of this opinion.

When an issue of first impression as to the interpretation of an insurance

contract is presented in South Dakota, the South Dakota Supreme Court has

held that there was no bad faith as a matter of law in denying the plaintiff's

claim where that claim was "fairly debatable" under the law. See Mudlin v. Hils

Materials Co., 2007 S.D. 118, ¶¶ 7-15, 742 N.W.2d 49, 51-54 (interpreting a

coming-and-going scenario under a worker's compensation insurance policy).

However, even without prior case law on point, the South Dakota

Supreme Court has also held that bad faith claims may be compensable, even

when an issue of first impression is presented, if the plaintiff's claim was not

"fairly debatable." Bertelsen v. Allstate Ins. Co., 2009 S.D. 21, ¶¶ 20-21, 764

N.W.2d 495, 500 (Bertelsen I) (interpreting a worker's compensation statute

providing that if an employer denied a claim as nonwork related, any other

insurer covering bodily injury "shall pay" according to its policy provisions and

applying that statute against an automobile insurer under its medical benefits provision); Isaac, 522 N.W.2d at 758 (holding that a jury question was created by plaintiff's bad faith claim even though there was no South Dakota law on point as to whether a worker's compensation set-off provision in the insurance policy was valid or void).

In addition, the fact that an insurance company may have been unaware of applicable law is also not grounds for summary judgment in favor of the insurance company.  Bertelsen v. Allstate Ins. Co., 2013 S.D. 44, ¶ 20, 833 N.W.2d 545, 555.

Here, the court's research reveals a split of authority in interpreting the two conflicting insurance provisions from The Hartford's policy.  Yet, many of those cases involved The Hartford itself as a party.  The stipulation by the parties for vacating the court's opinion in the Ramsey case is reminiscent of the trial lawyer who claims he has never lost a case:  the boast is often only true because the lawyer assiduously settles his "losers."

Jane O'Daniel died on September 3, 2010.  The Hartford denied Mr. O'Daniel's claim for benefits on May 26, 2011, and affirmed that decision on October 12, 2011.  The court must consider what the state of the law was in 2011 when The Hartford made its decision to deny Mr. O'Daniel's claim.  Isaac, 522 N.W.2d at 758.

Of the key cases discussed above interpreting contract provisions like the two key provisions in The Hartford policy (the medical treatment exclusion and the prescription drug exclusion with the "unless" clause), only Clark and Grobe had been decided by October, 2011. Both of those decisions would have indicated that The Hartford was required to pay Mr. O'Daniel's claim. Grobe, 679 F. Supp. 2d at 1033-34; Clark, 369 F. Supp. 2d at 778.

The Brown decision which would have supported The Hartford's denial of Mr. O'Daniel's claim was not decided until 2013, long after The Hartford had made its decision to deny Mr. O'Daniel's claim for benefits. Therefore, The Hartford cannot claim that it relied on Brown when denying Mr. O'Daniel's claim.

The Guin decision was issued in 2002 and thus formed part of the legal backdrop against which The Hartford denied Mr. O'Daniel's claim. But that decision is inapposite factually because the insured died as a result of ingesting a prescription drug for which he did *not* have a prescription from a doctor, thus landing that case squarely within the prescription drug exclusion without regard to the "unless" clause of that provision. Guin, 256 F. Supp. 2d at 546, 549.

The Cady and Arredondo decisions, issued in 2013 and 2012 respectively, also post-dated The Hartford's decision to deny Mr. O'Daniel's claim, so they could not have been relied upon by The Hartford as rationale for

its decision at the time of denial. Both <u>Cady</u> and <u>Arredondo</u>, like the <u>Guin</u> decision, are also inapposite factually because the insured persons in those cases used prescription drugs either without a prescription, or in a manner contrary to their doctors' instructions. <u>Cady</u>, 2013 WL 1001073 at * 1, *13; <u>Arredondo</u>, 860 F. Supp. 2d at 367-68, 370.

Bad faith is typically a question of fact. <u>Isaac</u>, 522 N.W.2d at 758. The court can determine issues of fact at summary judgment only if reasonable minds could not differ as to the facts. <u>Wittneier v. Gall</u>, 319 N.W.2d 501, 501 (S.D. 1982). There is enough conflicting evidence in the record as to what The Hartford knew at the time it denied Mr. O'Daniel's claim in 2011, and what the state of the law was at that time, that the court cannot conclude that reasonable minds could not differ and take this question of fact from the jury. Accordingly, the court denies The Hartford's motion for summary judgment on Mr. O'Daniel's second bad faith claim, paragraphs 29-34, there is a genuine issue of material fact for the jury to determine.

### 3.    Count Four–Bad Faith

The third bad faith claim asserted by Mr. O'Daniel in his second amended complaint is that The Hartford committed bad faith in denying the claim for Jane's death because The Hartford failed to recognize that the <u>Wolfe</u> decision was binding precedent and required that The Hartford pay the claim. As discussed above, for lots of reasons the <u>Wolfe</u> decision is not binding

precedent.  Accordingly, summary judgment should be granted to The Hartford on Count Four.  This does not, however, mean that the <u>Wolfe</u> decision is irrelevant.  It is still part of the backdrop of legal authority in existence at the time The Hartford made its decision to deny the claim for Jane's death.  As such, whether The Hartford knew about it and considered it in reaching its decision to deny benefits is relevant to whether The Hartford knew it had or did not have a reasonable basis for denying the claim.

**F.    Deceit Claim**

Count Five of plaintiff's second amended complaint alleges a claim for deceit.  A claim for fraud and deceit requires proof of "a representation . . . made as a statement of fact, which was untrue and known to be untrue by the party making it, or else recklessly made; [and] made with intent to deceive and for the purpose of inducing the other party to act upon it."  <u>Smith v. Hermsen</u>, 1997 S.D. 138, ¶ 14, 572 N.W.2d 835, 839 (quoting <u>Klinker v. Beach</u>, 1996 S.D. 56, ¶ 13, 547 N.W.2d 572, 576).  Questions of fraud or deceit are "questions of fact and are to be determined, ordinarily, by a jury."  <u>Id.</u> (quoting <u>Tucek v. Mueller</u>, 511 N.W.2d 832, 836 (S.D. 1994)).

In his second amended complaint, Mr. O'Daniel sets forth three statements made by The Hartford which he alleges are the basis of his claim of deceit.

a. Falsely telling O'Daniel that the policy that he purchased contained an exclusion that it did not contain;

b. Falsely telling O'Daniel that the policy exclusion that it relied on applied to the claim for Jane's death; and

c. Relying on a policy exclusion that was not in the policy, and that did not apply to the claim for Jane's death.

See Docket No. 47, pages 7-8.  Mr. O'Daniel clarified in briefing on these cross-motions for summary judgment that his deceit claim rests–at least in part–on The Hartford's allegedly erroneous interpretation of its own insurance policy. See Docket No. 72 at page 71.  For the same reasons the court recommends denial of The Hartford's request for summary judgment on the bad faith claim in Count III, the court also recommends denial of summary judgment on the deceit claim.

## CONCLUSION

Based on the facts and law discussed above, it is hereby

ORDERED that Plaintiff's motion to exclude Mark Socha as a witness and strike his affidavit [Docket No. 76] is denied.  If Mr. O'Daniel wishes to seek sanctions against The Hartford in the form of attorneys fees and costs related to The Hartford's failure to disclose Mark Socha as a witness and its failure to provide the correct Schedule 1.2 in discovery, Mr. O'Daniel should file a motion to that effect.

As to the cross-motions for summary judgment, this court respectfully recommends disposition as follows:

1.    Plaintiff's motion for partial summary judgment on Count I (Breach of Contract) [Docket No. 49] should be granted in part and denied in part.  Summary judgment should be granted  as to plaintiff's request for a ruling on coverage under the contract; the accompanying request for prejudgment interest is denied as presenting a fact question for the jury;

2.    Defendant's motion for summary judgment [Docket No. 54] should be denied as to Count Three–Bad Faith and denied as to Count Five–Deceit in Mr. O'Daniel's second amended complaint; defendant's motion for summary judgment as to Count Two–Bad Faith and Count Four-Bad Faith in the second amended complaint should be granted.

## NOTICE OF RIGHT TO APPEAL

The parties have fourteen (14) days after service of this Report and Recommendation and Order to file written objections pursuant to 28 U.S.C. § 636(b)(1)(B), unless an extension of time for good cause is obtained.  See Fed. R. Civ. P. 72(b).  A party may respond to another party's objections within 14 days of being served with a copy.  Id.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Id.  Objections must be

timely and specific. Timely, specific objections to the findings and conclusions on the summary judgment motions will be reviewed *de novo* by the District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986). Objections as to the motion to strike will be reviewed by the District Court to determine if this court's ruling was clearly erroneous and contrary to law. See 28 U.S.C. § (b)(1)(A).

Dated September 20, 2013.

BY THE COURT:

/s/ *Veronica L. Duffy*

VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE